**In the Matter of FBN FOOD SERVICES, INC., Debtor.**

**River Bank America, Appellant.**

**Nos. 95–2099, 95–2954.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 3, 1996.

Decided May 2, 1996.

Rehearing Denied May 17, 1996.

Louis W. Levit (argued), Leslie D. Locke, Brian L. Shaw, Ross & Hardies, Chicago, IL, Ralph A. Siciliano, Vincent J. Syracuse, John P. Curran, David A. Pellegrino, Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, New York City, for River Bank America in No. 95–2099.

Kenneth E. Marcus (argued), James E. Carmel, Carmel & Marcus, Chicago, IL, for James E. Carmel, Trustee in No. 95–2099.

Michael K. Desmond, Chicago, IL, for M. Scott Michel, United States Trustee.

Stephen T. Bobo, David A. Newby (argued), D'Ancona & Pflaum, Chicago, IL, for SIG Food Services Associates.

Kenneth E. Marcus, James E. Carmel, Carmel & Marcus, Chicago, IL, for FBN Food Services Incorporated.

Louis W. Levit (argued), Leslie D. Locke, Brian L. Shaw, Ross & Hardies, Chicago, IL, Ralph A. Siciliano, Vincent J. Syracuse (argued), Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt, New York City, for River Bank America in No. 95–2954.

Donald C. Shine, John K. Kneafsey (argued), Gregory C. Ward, Nisen & Elliott, Chicago, IL, for James E. Carmel, Trustee in No. 95–2954.

Before POSNER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

During the 1980s River Bank America lent more than $7 million to SIG Food Services Associates (SFSA), to finance SFSA's purchase of equipment for a group of Sizzler Family Steakhouses. SFSA leased the equipment to FBN Food Services, Inc., which operated the restaurants. SFSA and FBN had common equity owners: SIG Partners, Quest Equities Corp. (a subsidiary of River Bank), and Anthony Basile. SFSA later borrowed $6.5 million from American National Bank (ANB); River Bank agreed to stand behind ANB in the queue for payment. The business venture was not a success, and for the last six years the equity and debt investors have been fighting for larger shares of the carcass. FBN is being liquidated under Chapter 7 of the Bankruptcy Code. River Bank has filed two appeals: one protests an order that it return $1.4 million as a fraudulent conveyance, and the other complains about a decision by FBN's trustee that FBN owes some $2.4 million to SFSA.

## I

Litigation often accompanies failure in the marketplace. When it became clear that the restaurants were unprofitable, FBN filed suit against Sizzler Restaurants International, the franchisor. Sizzler counterclaimed, and it also initiated an arbitration against Midwest Restaurant Concepts (MRC), an enterprise affiliated with FBN and SFSA, which had promised (but failed) to indemnify Sizzler against losses arising out of transactions with FBN. In September 1990 everyone sat down to parley, and a bargain was reached. Sizzler would dismiss the MRC arbitration (the firm lacked assets to pay any award), and all counterclaims filed in that arbitration also would be dismissed. Sizzler agreed to pay $4,175,000 to resolve the litigation. In exchange, it wanted releases from FBN, SFSA, MRC, and all of those ventures' principals—SIG Partners, Basile, Quest Equities, and River Bank (which controlled Quest). The largest share went to SFSA, which transferred two parcels of real estate to Sizzler. Quest and River Bank refused to sign the agreement unless they received $2.125 million. Rather than see the deal collapse, Basile (who spoke for FBN) and Gerald Kaufman (who spoke for SIG Partners) agreed. Sizzler disbursed $1.8 million to SFSA, $1.5 million to Quest, $625,000 to Riv-

er Bank, and $250,000 to FBN. Sizzler got the restaurants, the property, and an end to a losing association with FBN. For everyone else, the dance was just beginning.

The allocation of the settlement proceeds to its investors left FBN with neither a business nor significant assets, and it collapsed, stiffing its trade creditors. Bankruptcy proceedings followed. American National Bank, which had not been at the table, learned that the $1.5 million paid to Quest had been credited against River Bank's loan to SFSA. (Actually only $1.4 million had been credited; the rest was apportioned to legal expenses, a step no one questions.) This was more than a little peculiar, on three grounds: first, the money had been paid to Quest (an equity investor in FBN), not to River Bank; second, the litigation against Sizzler had been filed by FBN, not SFSA, so it was unclear how proceeds of the settlement ended up being used to reduce SFSA's debt to River Bank; third, there was the matter of River Bank's subordination agreement. River Bank had promised that ANB would be paid first—but River Bank helped itself to a $1.4 million payment on the loan. Threats of litigation followed, and River Bank agreed to reverse the credit and assign SFSA's notes to ANB, which became SFSA's creditor to the tune of approximately $15 million. Quest then treated the $1.4 million as a return of equity—a problematic transaction, and not only because FBN had no business buying back its equity while creditors were unsatisfied. Back in 1988 River Bank had asked Basile to find some outside capital, and Basile induced World Life & Health Insurance Company to loan $1 million, taking out that much of River Bank's loan. World Life was not willing to make the loan without security, which it got in the form of a guarantee from William Landberg, who wanted compensation for putting his funds at risk. Avrom Waxman, the president of both River Bank and Quest, promised Landberg that in exchange for the guarantee Quest would turn over to Landberg Quest's equity in FBN and SFSA. Waxman promised Basile that if he landed the outside $1 million, Quest would forgive a $100,000 note Basile had signed. So by 1990 Quest may not have been an equity investor. We say "may not" because Waxman denies that he made these promises, and after River Bank pocketed the $1 million Quest refused to sign its equity over to Landberg.

The $100,000 note was part of the initial financing for FBN and SFSA. SIG Partners wanted to hire an experienced manager for the restaurant business and came to terms with Basile, then a partner at Arthur Young & Company. SIG Partners also wanted the venture's managers to be investors, the better to whet their appetite for profits. Basile lacked liquid funds. In exchange for a 25 percent equity interest in SFSA, Basile gave notes for $100,000 apiece to Quest and SIG Partners. SFSA gave Basile a note for $200,000 (on which SFSA has never paid a dime); Quest and SIG Partners reduced their (stated) equity interests in SFSA by $100,000 each. Waxman used the prospect of forgiving Basile's note to Quest as a carrot to get him looking for outside capital. Two years later, Waxman used the $100,000 note again—as a club. Basile was reluctant to approve the payment of $1.5 million from the Sizzler settlement to Quest. Waxman told Basile that, unless he acquiesced, Quest would collect the note despite its earlier forgiveness. Basile knuckled under and signed. Waxman, not one to leave money on the table, then tried to collect the note anyway! Quest filed a diversity action against Basile, who defended on the ground that the debt had been forgiven in 1988. A swearing contest ensued, and the jury believed Basile. See *Quest Equities Corp. v. Basile,* 1994 WL 110393, 1994 U.S. Dist. LEXIS 3877 (N.D.Ill. 1994). Meanwhile, SFSA (together with Basile and Landberg) turned on its former investors and sued Waxman, Quest, River Bank, and several related entities under the Racketeer Influenced and Corrupt Organizations Act (RICO). SFSA described the failure to turn the equity over to Landberg, the extraction of the $1.4 million from the Sizzler settlement, the attempt to collect Basile's note, and some other acts as ingredients in a "pattern of racketeering activity." That suit came to a close when we held that River Bank's acts were at worst a commercial fraud, which did not satisfy the "continuity" component of RICO's pattern requirement. *SIG Food Services Associates v. Mann,* No.

93–3267, 1994 WL 260754 (7th Cir. June 14, 1994) (unpublished order).

A solitary commercial fraud does not lead to liability under RICO, but it may have consequences under other federal statutes, including the Bankruptcy Code. James E. Carmel, the trustee in FBN's liquidation, commenced an adversary proceeding to recover the $1.4 million as a fraudulent conveyance under 11 U.S.C. § 548(a). Under this statute,

> the trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> (1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation incurred, indebted; or
> (2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer. . . .

Carmel made arguments under both subsections. Waxman's threat to collect $100,000 that Quest had already forgiven showed, Carmel insisted, that River Bank and Quest had the "actual intent to hinder, delay, or defraud [an] entity to which [FBN] was ... indebted". At all events, Carmel contended, FBN was insolvent at the time of the payment to Quest and did not receive "a reasonably equivalent value in exchange for such transfer". If River Bank had credited the $1.4 million to the SFSA loan, one might have said that FBN received value indirectly (because the payment would have reduced FBN's obligations to SFSA). But once River Bank reversed the credit and signed SFSA's unreduced notes over to ANB, neither FBN nor SFSA received any value from the transfer. Judge Sonderby of the bankruptcy court held a three-week trial and concluded that the $1.4 million was a fraudulent conveyance under both § 548(a)(1) (actual fraud)

and § 548(a)(2) (constructive fraud). 175 B.R. 671 (Bankr.N.D.Ill.1994). The appeal went to Chief Judge Aspen, who affirmed after concluding that none of the dispositive findings of fact is clearly erroneous. 185 B.R. 265 (N.D.Ill.1995).

## II

■ Shortly before the trial, Judge Sonderby dashed River Bank's principal hope for damage control. By the filing deadline in December 1991, only $450,000 in claims had been made against FBN. As River Bank saw things, this meant that its exposure in the fraudulent conveyance action was only $450,000: the estate could recover no more than was necessary to pay its debts. (Whether this is a correct understanding is a subject to which we return.) In April 1993 Carmel and SFSA filed with the bankruptcy court a stipulation that increased the estate's obligations by $2.4 million. River Bank's exposure suddenly leapt to $1.4 million, plus interest. It cried foul, because the agreement came after the bar date and because SFSA's other investors—the potential beneficiaries of the claim against FBN—were complicit in any fraudulent conveyance. Carmel asserts that SFSA is a secured creditor of FBN, exempt from the filing deadline, see 11 U.S.C. §§ 501, 506, but Judge Sonderby declined to address River Bank's objections, ruling that it was not (yet) a "party in interest" as 11 U.S.C. § 502(a) uses that term:

> A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

"Party in interest" means "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding". *In re James Wilson Associates,* 965 F.2d 160, 169 (7th Cir.1992). Because River Bank had not filed a claim in FBN's bankruptcy, its stake could not be diluted by payments to SFSA. Judge Sonderby thought that River Bank could *become* a creditor if ordered to turn over the $1.4 million; in exchange for returning the fraudulent conveyance, River Bank could revive any claim it originally had

against FBN. Under § 548(c), a "transferee ... that takes for value and in good faith has a lien on or may retain any interest transferred ... to the extent that such transferee ... gave value to the debtor in exchange". And "value" includes "satisfaction or securing of a present or antecedent debt". 11 U.S.C. § 548(d)(2). A defendant in a fraudulent-conveyance action therefore is a contingent creditor of the estate, potentially interested in the value of competing claims. But the bankruptcy judge thought that further analysis should abide decision until the contingency comes to pass. Otherwise adjudication about the validity of competing claims could be advisory. (None of FBN's existing creditors objected to the recognition of SFSA's claim.)

Unwilling to wait for the outcome of the fraudulent conveyance action, River Bank immediately appealed to the district court and soon rued its decision. Judge Conlon affirmed on a different ground. She concluded that River Bank is not a "party in interest" because it is *not* a contingent creditor. As Judge Conlon saw things, a fraudulent conveyance is "void," and the estate in bankruptcy therefore may retain the whole transfer even if it produces a dividend for equity investors—and even if the equity investors are the real authors of the fraud.

The fraudulent-conveyance proceeding came to a conclusion in the bankruptcy court before Judge Conlon rendered her decision. Under Judge Sonderby's approach, the conclusion that River Bank had received a fraudulent conveyance turned a contingent creditor into a real creditor, which should have revived the questions whether FBN owed Quest or River Bank anything at the time of the Sizzler settlement, and, if yes, whether the settlement between trustee Carmel and SFSA is valid. But the appeal before Judge Conlon must have distracted the parties and Judge Sonderby alike, for no one turned back to the question. Now River Bank has appealed to us from Judge Conlon's decision and asks us to resolve this dispute independently of the fraudulent-conveyance action.

■ It is hard to see how the two sensibly can be separated; it is impossible to see how we are authorized to resolve the two issues

independently. District judges may entertain interlocutory appeals in bankruptcy actions. Courts of appeals, by contrast, may hear appeals only from final decisions. 28 U.S.C. § 158(d). A single bankruptcy case may comprise many separate controversies, so we have held that a final decision for purposes of § 158(d) is one that would be immediately appealable in a stand-alone action. *In re Morse Electric Co.,* 805 F.2d 262 (7th Cir.1986). The order requiring River Bank to return the $1.4 million meets that description; the order postponing adjudication of River Bank's objection to SFSA's claim does not. Decisions about the sequence in which to resolve questions are almost the polar opposite of finality, so Judge Sonderby's initial treatment of River Bank's objection to SFSA's claim cannot be called "final." Does Judge Conlon's new ground of decision make it final? We think not, for, if River Bank had prevailed in the fraudulent-conveyance action, it would have had no complaint about Judge Conlon's decision. Not until Judge Sonderby held that River Bank had received a fraudulent conveyance did the handling of SFSA's claim acquire concrete significance.

■ One might say that River Bank's initial objection to SFSA's claim cast River Bank in the role of would-be intervenor. As a non-creditor, River Bank had not so far been a party to FBN's bankruptcy proper— that is, to the core proceedings in the bankruptcy. In order to facilitate its objection to SFSA's claim, River Bank sought admission, and it was turned away on the ground that it lacked a legal interest. Outside of bankruptcy, an order denying a motion to intervene is immediately appealable. *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 687–88, 81 S.Ct. 1309, 1311–12, 6 L.Ed.2d 604 (1961). Does this imply that the order rebuffing River Bank is likewise final? No, it does not, because the foundation for immediate appeal when the court rejects an attempt to intervene is that the litigation will continue without the putative intervenor, which will not be entitled to appeal at the end of the case, for it will not then be a party. *Brotherhood of Railroad Trainmen v. Baltimore & Ohio R.R.,* 331 U.S. 519, 524, 67 S.Ct. 1387,

1389–90, 91 L.Ed. 1646 (1947). The order denying intervention is the one and only decision that could ever be appealed. By contrast, River Bank wanted to contest SFSA's claim precisely because the size of FBN's debts would affect a later decision in the bankruptcy—a decision to which River Bank would be a party, and from which it could appeal. This right to appeal shows that the earlier decision was not conclusive, and hence not appealable. *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375 (7th Cir.1985). As if to demonstrate that its appeal from Judge Conlon's decision was premature, River Bank argued to Judge Aspen that it should not have to cough up the whole $1.4 million, because FBN's bona fide debts were only $450,000. Judge Aspen rejected that contention under the law of the case; he was (rightly) unwilling to reexamine Judge Conlon's decision. 185 B.R. at 277. But the law of the case does not prevent a superior court from adjudicating the whole controversy. *In re Reliable Drug Stores, Inc.*, 70 F.3d 948, 951 (7th Cir.1995); *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir.1990). All of River Bank's arguments about FBN's debts (if any) to SFSA therefore are before us, but on the appeal from Judge Aspen, not the appeal from Judge Conlon.

### III

■ At last we arrive at the central question: was there a fraudulent conveyance? One might suppose the principal question would be whether River Bank received a preference; it tried to jump the queue of creditors. But the trustee raised and then abandoned a preference claim, and we respect the parties' right to choose which issues they will litigate. River Bank contends that it did not receive a fraudulent conveyance because it did not receive *any* conveyance from FBN. The check was written on Sizzler's account. To avoid the response that this was just an appointment of income, see *In re Kochell*, 804 F.2d 84 (7th Cir.1986); *In re Compton Corp.*, 831 F.2d 586, 591–92 (5th Cir.1987)—that FBN told Sizzler, its debtor, to pay River Bank directly, in order to reduce paperwork—River Bank maintains that Sizzler did not owe money to FBN to begin with. It believes that Sizzler's claims against

MRC were strong, while FBN's claims against Sizzler were weak. Because Sizzler could not possibly have been willing to pay more than $250,000 for the value FBN gave by releasing its claims, River Bank concludes, the balance of the consideration must have been supplied by Quest and River Bank itself, so the money really belonged to River Bank all along, and there has been no "transfer" (fraudulent or otherwise) from FBN.

This line of argument has two problems: first, it is irrelevant; second, it is wrong. It is irrelevant because a business mistake by Sizzler (overpaying its adversary in litigation) would not make the payment less real. Suppose FBN found a buyer willing to pay $1.4 million in excess of market value for FBN's inventory and assets. The money would have belonged to FBN; Basile could not have handed it over to River Bank without committing a fraud on FBN's creditors. It is wrong because the bankruptcy judge found that Sizzler had not paid anyone except FBN and SFSA. River Bank and Quest did not have any legal claims against Sizzler, so what consideration did they furnish? Neither firm even participated in the mediation. We can see why Sizzler wanted their releases. These investors in SFSA and FBN have demonstrated a willingness to litigate at the drop of a hat. Rational businesses want to cut down on the number of spurious claims they must meet. But promising to cease making a pest of oneself is different from compromising a bona fide claim to compensation. River Bank had no right to payment from Sizzler, had indeed no *claim* to payment from Sizzler, and the bankruptcy judge's finding that Sizzler paid FBN rather than River Bank therefore is not clearly erroneous. The $1.4 million must be understood as a transfer from FBN to Quest, and thus to River Bank.

Bankruptcy Judge Sonderby found that the transfer was fraudulent because it was made within one year of the bankruptcy, FBN was insolvent at the time, and FBN "received less than a reasonably equivalent value in exchange for such transfer or obligation". 11 U.S.C. § 548(a)(2)(A). River Bank does not contest any of these findings, though it tries to avoid the third by arguing

that what FBN received *from Sizzler* counts as the "reasonably equivalent value". That is just another version of the argument that Sizzler overpaid FBN in the settlement, no stronger the second time around. FBN transferred $1.4 million to Quest and received, in exchange—nothing.

Subsection 548(a)(2) often is called "constructive fraud" because it omits any element of intent. Subsection 548(a)(1), which condemns transfers made "with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted", goes by the label "actual fraud" because of its intent ingredient. The bankruptcy judge found that by threatening to collect Basile's $100,000 note, River Bank committed actual fraud and incurred liability under § 548(a)(1) as well. Judge Sonderby added that River Bank committed a second fraud by threatening Kaufman that, unless he agreed to the payment, River Bank would enforce Kaufman's guarantee of some loans unrelated to FBN and SFSA. The trustee's right to recover the transfer does not depend on § 548(a)(1), given the findings under § 548(a)(2). But because the difference between actual and constructive fraud may matter to the disposition of the recovered proceeds, we think it important to examine liability under both subsections. (Sections IV and V below explain how the legal effects of actual and constructive fraud may differ in this case.)

■ Two portions of the bankruptcy judge's analysis under § 548(a)(1) give us pause. It is easy enough to see how River Bank's threats could be called extortion or even blackmail. As a rule, one can't threaten to take even a lawful step, when the purpose is to turn an agent against his principal. Suppose the reason Basile signed over $1.4 million of FBN's money was to save $100,000 of his own. If Basile owed nothing, and River Bank knew it, the threat to try to collect would be nothing but subornation of an agent. Our first difficulty with this, however, is that § 548(a)(1) does not deal with frauds on (or extortion against) corporate officers. It deals with frauds against the creditors of the transferors. The question posed by the statute is whether someone had the actual intent to hinder or defraud FBN's

trade creditors, or other entities to which FBN was indebted. It may be that Waxman (for River Bank) and Basile (with his arm twisted behind his back) had such an intent, and that the machinations used to induce Basile and Kaufman to sign on the dotted line show this, but the bankruptcy judge did not make that finding. Suppose that, at the time of the Sizzler settlement, FBN owed $500,000 to River Bank and had no other creditors. Holding a gun to Basile's head (or blackmailing him) to induce Basile to sign over $1.4 million might be a crime, and a fraud on FBN's stockholders (who otherwise would receive the $900,000 surplus), but it would not be a fraud *on FBN's creditors*— and it is this sense in which § 548(a)(1) speaks of fraud.

■ Our second difficulty with the finding is that both the bankruptcy judge and the district judge equated financial pressure with "fraud." Suppose Kaufman had guaranteed SFSA's debts to River Bank. During the settlement negotiations, Waxman doubtless would have reminded Kaufman that every dollar paid to River Bank is a dollar's less exposure on the guarantee. Would that reminder spoil the transfer? Hardly; guarantees are designed to have precisely this effect. Lenders hope that the guarantors (especially inside guarantors) will use their influence to ensure that the debtors pay up. Cf. *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989). Everyone knows that guarantees have this effect; and an anticipated, even bargained-for, incentive cannot be relabeled fraud when the guarantor acts in his self-interest to induce the debtor to repay the loan. See *Kham & Nate's Shoes No. 2 v. First Bank of Whiting*, 908 F.2d 1351, 1356–57 (7th Cir.1990); *Mirax Chemical Products Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 570 (8th Cir.1991). So too with loans. Basile's $100,000 note to Quest was to be paid in the end by SFSA. Basile therefore had every reason to help FBN and SFSA pay off their outside debts so that there would be profits left to distribute to him, and he could pay down the note. The note was a small part of a financial structure in which Basile's earnings were linked to the venture's suc-

cess; a waste of corporate funds could cost Basile more in his role as equity holder (and creditor of SFSA) than he could gain in his role as Quest's debtor.

Most likely the bankruptcy and district judges were well aware of this, but thought the actual financial pressure impermissible nonetheless: Basile's note had been forgiven, so Waxman's statements amounted to a threat to file frivolous (but costly) litigation, which no one has a right to do (see *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741–44, 103 S.Ct. 2161, 2168–71, 76 L.Ed.2d 277 (1983); *Premier Electrical Construction Co. v. National Electrical Contractors Ass'n, Inc.*, 814 F.2d 358, 371–72 (7th Cir.1987)); and Kaufman's guarantees did not cover either FBN's or SFSA's debts to River Bank, so Waxman's pressure on him induced SIG Partners' agent to abandon the interests of his principal. Because neither judge drew this line explicitly, however, and because both judges' opinions can be read to condemn, as fraudulent, any effort to collect a debt by reminding the debtor's managers that payment is in their personal interest, we are reluctant to affirm the judgment on a § 548(a)(1) theory. That subsection nonetheless remains available if it turns out to matter when the time comes to distribute FBN's assets.

If there was only constructive fraud under § 548(a)(2)—if, that is, the payment was designed to preserve the principals' commercial reputations even in the absence of a legal obligation to pay, or if the money was a gift by a generous FBN, like the charitable contribution in *Scholes v. Lehmann*, 56 F.3d 750 (7th Cir.1995)—then, River Bank believes, it is entitled to any surplus remaining after full payment to FBN's bona fide outside creditors, the $450,000 in claims that were timely filed (plus interest and the costs of administration). A transfer from FBN is really from its equity owners (who can part with their money, but not with trade creditors'). Basile, Kaufman, and SIG Partners parted with the money for their own reasons. So if money remains, and the trustee can pay either River Bank or SFSA, then, River Bank insists, the trustee should give it the residue—for SFSA is just Basile, Kaufman, and

SIG Partners, who already have relinquished their claims. Many cases interpreting state fraudulent conveyance law say that, once outside creditors have been satisfied, the transaction remains valid between the transferor and transferee. E.g., *Windle v. Flinn*, 196 Or. 654, 672, 251 P.2d 136, 144 (1952); *Service Mortgage Corp. v. Welson*, 293 Mass. 410, 413, 200 N.E. 278, 280 (1936). Some of these are from Illinois, whose law governs to the extent state law plays a role in defining the parties' rights. E.g., *Feltinton v. Rudnik*, 401 Ill. 362, 363, 82 N.E.2d 436, 437 (1948). For example, if Basile, having $100,000 in net assets, had given $200,000 to his alma mater, that transfer would have been avoidable under § 548(a)(2); but if after paying Basile's creditors the trustee in bankruptcy had $100,000 left over, the money should be restored to the college rather than be given back to Basile. This possibility, we gather, is what Judge Sonderby originally contemplated in calling River Bank a contingent creditor.

### IV

■ According to Trustee Carmel, River Bank cannot recover any part of the $1.4 million from the estate even if the fraud is only "constructive", so we can affirm without ado. He gives two reasons. First, he contends, the $450,000 in trade debt is only the beginning. Once FBN's estate has another $1.4 million in the kitty, he plans to invite other creditors to file additional claims, and these could be more than enough to consume the estate. Second, he invokes Judge Conlon's conclusion that under the Bankruptcy Code a fraudulent conveyance is "void" and state law, irrelevant. Neither of these lines persuades; we start with the first.

■ Trustee Carmel believes that some creditors may have assumed that FBN lacked assets, and that this assumption caused them to think that formal claims would not be worthwhile. Knowledge that the estate has additional assets would change the calculus, the trustee contends, justifying a new round of notice and claims. Yet the final date for filing claims in this bankruptcy is long passed. Creditors had full notice and ample opportunity to make their claims.

The process of filing claims frequently precedes the marshaling of assets; if every infusion of cash from an exercise of the trustee's avoiding powers reopened the claims period, corporate bankruptcies could be indefinitely extended (and the expense of administration indefinitely increased). They are long and expensive enough as it is. Filing claims is cheap and easy; when a claim can be filed for an outlay of a few dollars, a change in the estate's assets cannot be a good reason for a second opportunity. "The Bankruptcy Code does not require much; a simple, one-page claim suffices. Creditors who do not do even that much, on time, forfeit their entitlement to distributions from the estate." *In re Plunkett*, 82 F.3d 738, 742 (7th Cir.1996). Under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, only "excusable neglect" permits a creditor to file or amend a claim after the bar date. *Plunkett*, 82 F.3d at 742; see also *In re Stavriotis*, 977 F.2d 1202 (7th Cir.1992); *In re Unroe*, 937 F.2d 346 (7th Cir.1991). "Late-filed claims, especially in the bankruptcy context, disrupt orderly discharge and should generally be barred." *Unroe*, 937 F.2d at 351. A creditor's failure to anticipate the trustee's success in recovering additional funds does not establish excusable neglect for belated claims, so the list of claims against FBN's estate must be deemed closed.

 As for the possibility that a fraudulent conveyance is "void": the Bankruptcy Code does not use that term, which even if applicable does not answer the question "what happens next?" Section 550(a) says that the trustee recovers "the property transferred"—here, the $1.4 million. Once the whole transfer has been pulled into the estate, the money is distributed according to the priorities established by the Code and the debtor's own commitments. Both § 548(c) and § 550(b)(1) permit a transferee to retain any portion of the payment supported by value given (including satisfaction of an antecedent debt). Other creditors have priority for any net recovery, because a debt beats a non-debt every time. But neither section says, or implies, what happens if there is a surplus after all debts have been paid, and the remaining contestants are the equity claimants and the recipient of the avoided transfer. To answer that question— for example, do the equity holders have a contractual (but non-debt) commitment?-the court must turn elsewhere. Once the rules established by the Code have been exhausted, remaining entitlements come from outside bankruptcy, which is to say from state law. See *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Central Ice Cream Co.*, 836 F.2d 1068 (7th Cir.1987); *Kham & Nate's*, 908 F.2d at 1361. Cf. *Field v. Mans*, — U.S. —, —— ——, 116 S.Ct. 437, 443–46, 133 L.Ed.2d 351 (1995). No surprise, then, that courts regularly have looked to state law (under both the Bankruptcy Act of 1898 and the Bankruptcy Code of 1978) to determine how much the recipient of a fraudulent conveyance can claim in the bankruptcy. See *Wellman v. Wellman*, 933 F.2d 215, 218 (4th Cir.1991); *In re Vintero Corp.*, 735 F.2d 740, 742 (2d Cir.1984); *Whiteford Plastics Co. v. Chase National Bank*, 179 F.2d 582 (2d Cir.1950). Cf. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 60, 109 S.Ct. 2782, 2800, 106 L.Ed.2d 26 (1989) (remarking on the relation between the common law and the Code's treatment of fraudulent conveyances). We think these cases correctly decided. They are wholly consistent with *In re Acequia, Inc.*, 34 F.3d 800, 811 (9th Cir.1994), a case under § 544(b) on which the trustee heavily relies. *Acequia* holds that the trustee's recovery is not limited to the amount of debt senior to the defendant in the preference-recovery action. See *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931). It has nothing to do with identifying who gets how much when the estate distributes its assets.

## V

River Bank believes that state law puts it ahead of SFSA in the queue for payment, but it would be premature to pursue this argument to a conclusion. Although River Bank treats SFSA as if it were just Basile, Kaufman, and SIG Partners, this record does not show what will become of any distribution to SFSA from the FBN estate. For all we know, SFSA will turn the money over to ANB as a payment on the loan, and ANB

unquestionably has a claim superior to River Bank's. This uncertainty, coupled with the ambiguities we have identified in the findings related to "actual fraud," mean that further proceedings lie ahead. When the case returns to the bankruptcy court, the judge should address a series of questions:

1. Did the transfer occur with actual intent to defraud FBN's creditors (as opposed to an intent to defraud Basile and Kaufman personally, or to defraud FBN's equity investors)? If the answer is yes, then River Bank has no claim to any amount left over after satisfying FBN's debts, and this adversary proceeding is at an end.

2. If the transfer is avoided only under § 548(a)(2), then the identity of the distributees via SFSA matters. The court should determine whether payments to SFSA will end up in the hands of Basile, Kaufman, and SIG Partners. If ANB and other outside creditors are the real parties in interest, then again River Bank has no legitimate objection to the trustee's recognition of SFSA's claim.

3. If a distribution to SFSA is likely to be redistributed to SFSA's equity investors, then the court must address two further questions: first, whether the trustee's recognition of SFSA's belated claim was proper (recall that this is the question Judge Sonderby originally planned to address once River Bank had become a real rather than a contingent creditor), and, second, if the trustee's action was proper, whether under Illinois law River Bank takes ahead of the equity investors. At this point the possibility of fraud on Basile and Kaufman personally may re-emerge. They can't give away creditors' money, but they can give their own equity positions to Quest, another equity owner (and therefore, indirectly, to River Bank); but if Waxman's arm-twisting was real fraud, as opposed to commercial pressure, then the transfer cannot be understood even as a gift, and River Bank cannot recoup any portion of it.

Appeal No. 95–2099 is dismissed for want of jurisdiction. On appeal No. 95–2954, the judgment is affirmed to the extent it holds River Bank to be the recipient of a fraudulent conveyance under § 548(a)(2), and the case is remanded for further proceedings, consistent with this opinion, to resolve the competing claims of River Bank and SFSA to any surplus remaining after satisfaction of FBN's *bona fide* outside debts, and the expenses of administering the estate.