**In re James A. SCOTT a/k/a Tony Scott, Debtor.**

**Thomas A. KRUDY, Trustee, Plaintiff,**

**v.**

**James A. SCOTT a/k/a Tony Scott and Brenda Scott, a/k/a Brenda Sue Hanning, Defendants.**

**Bankruptcy No. 95–9829–RLB–7. Adversary No. 96–463.**

United States Bankruptcy Court, S.D. Indiana, Indianapolis Division.

May 20, 1998.

Paul D. Gresk, Gresk and Singleton, Indianapolis, IN, for plaintiff.

Bruce D. Brattain, Brattain & Minnix, Indianapolis, IN, for defendant.

*FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ENTRY ON COMPLAINT TO DENY DISCHARGE, AND FOR THE SETTING ASIDE OF FRAUDULENT CONVEYANCES*

ROBERT L. BAYT, Bankruptcy Judge.

This matter is before the Court on the Complaint to Deny/Revoke Discharge, for the Turn Over of Property, for the Setting Aside of Fraudulent Conveyances, Motion for Temporary Restraining Order, and for Preliminary Injunction ("Complaint"), filed by Thomas A. Krudy, Trustee ("Trustee") on November 12, 1996. A trial on the Complaint was held on March 26, 1998, and on April 17, 1998. The Court, having considered the Complaint and the matters presented at the trial before the Court, and pursuant to Federal Rule of Civil Procedure 52 and Bankruptcy Rule 7052, now makes its

## FINDINGS OF FACT

1. James A. Scott a/k/a Tony Scott ("Debtor") filed a petition under Chapter 7 on December 19, 1995. Brenda Scott ("Mrs. Scott") is the wife of the Debtor, and is an "insider" as that term is defined in 11 U.S.C. Section 101(31).

2. During the year prior to the petition filing, the Debtor's primary business activity was as a Director of International Sales for Insight Imaging, Inc. ("Insight"). The Debtor marketed dental equipment for Insight in Europe, Asia, and Australia, and spent a substantial amount of time traveling in connection with his work. The Debtor's agreement with Insight included a periodic draw against his commissions, and the reimbursement of travel expenses. In 1995, Insight issued a W–2 form to the Debtor in the amount of $106,000,[1] as compensation for the services the Debtor provided to Insight in his role as Director of International Marketing. Because Insight frequently failed to pay the Debtor the monies due him, the Debtor would keep proceeds generated from sales of Insight products and use the proceeds for his own purposes, rather than turning the proceeds over to Insight.

3. From at least 1994 through 1996, in addition to his employment with Insight, the Debtor operated a business under the assumed name of Knowledge Systems International ("KSI"). KSI was a sole proprietorship, which serviced the former clients of Envision Imaging Technologies ("Envision"), a corporation formerly owned and operated by the Debtor. KSI was a viable business at the time of the bankruptcy filing, with gross sales in 1994 of $231,870 [Def.Ex. 369], in 1995 of $107,887 [Def.Ex. 376], and in 1996 of $122,031 [Def.Ex. 382]. Gross deposits placed into the KSI Account in 1995 exceeded $380,000. Some portion of the $380,000 were Insight funds placed in the KSI Account by the Debtor. The Debtor admitted at the hearing that he converted Insight funds to his own use.

4. The Debtor and Mrs. Scott maintained several accounts in various financial institutions. The Debtor maintained an account for KSI at NBD Bank (the "KSI Account"), which account was numbered 4356 0241 0552 7636. Mrs. Scott maintained an account at First of America (the "First of America Account"), which account was numbered 77 1028165 5. Mrs. Scott also maintained an investment account at Waterhouse Securities, Inc. (the "Waterhouse Account"), which account was numbered 380 27768–1–9. The Waterhouse Account was in Mrs. Scott's name alone, and only Mrs. Scott had the authority to remove funds from the Waterhouse Account.

5. From July to December of 1995, all within one year of the Debtor's bankruptcy filing, the Debtor controlled and transferred from the KSI Account to Mrs. Scott the sum of $77,186.84 (the "Transferred Funds"). The Debtor testified that he would take cash from the KSI Account, turn it into a cashier's check by running it through Mrs. Scott's First of America Account, and then deposit the monies into Mrs. Scott's Waterhouse Account. At other times he took cash or a

---

1. Even though the Debtor received a W–2 from Insight in the amount of $106,000 for 1995, he reported only $36,000 in income on his bankruptcy schedules for the year 1995.

cashier's check from the KSI Account and deposited it directly into Mrs. Scott's Waterhouse Account. The Debtor further testified that he sent the monies in issue through this circuitous route, in order to avoid collection efforts by the Internal Revenue Service.

Trustee's Counsel:

> But generally, your statement was, it goes from cash, to cashier's check, to wife's account at First Indiana, to Waterhouse.

Debtor:

> That's the statement.

Trustee's Counsel:

> And generally, would that be correct, that all of that was done to avoid these assets being acquired by your creditors, including the IRS?

Debtor:

> For the most part, yes.

The Debtor contends that the reason he put the monies in various accounts, was because they were Insight funds, and that he feared that the Internal Revenue Service would attach the monies if he put them in his own account. The facts indicate, though, that the Debtor made use of the funds as if they were his own.

6. In the month of December 1995, immediately prior to the filing of the Debtor's bankruptcy petition, the Debtor transferred into Mrs. Scott's First of America Account essentially all of his December income in the amount of $14,369.96. *See* Plaintiff's Exhibit 12. The Debtor received no consideration in exchange for the transfer, and was insolvent at the time he made the transfer.

7. Although the Waterhouse Account was in Mrs. Scott's name, the Debtor had a power to attorney to effect sales and purchases of stocks in the account. Only the Debtor engaged in trades with respect to the Waterhouse Account. The monthly statements for the Waterhouse Account reflect that he engaged in the following trades in mid–1995:

| July 1995 | Bought $43,730.56 | Sold $0.00 [Pl.Ex. 4] |
| Aug. 1995 | Bought $58,241.50 | Sold $26,810.97 [Pl.Ex. 5] |
| Sept. 1995 | Bought $36,216.91 | Sold $19,207.03 [Pl.Ex. 6] |

8. As a result of the Debtor's active trading in the Waterhouse Account, substantial income was generated between July and December of 1995, which in part made its way back into the possession and control of the Debtor. The additional income was not disclosed by the Debtor in his petition, and would have been additional assets of the Debtor's estate, given that the income was generated as a result of transfers the Debtor made to the Waterhouse Account from his own funds. Although the Debtor asserted at trial that the Transferred Funds were the property of his employer, Insight, the Debtor used the funds as if they were his own (to, *inter alia*, pay off automobile loans, and to purchase a house and furniture), and failed to produce records that would conclusively establish that he ever paid the funds back to Insight.

9. In addition to the Debtor using the Transferred Funds to carry on numerous and substantial security trades, $24,000 of the funds were used by Mrs. Scott, presumably at the Debtor's direction, to purchase a house approximately one month after the Debtor's bankruptcy filing.[2] The house was titled in Mrs. Scott's name alone. Additionally, some of the Transferred Funds (as well as the approximately $14,000 that the Debtor deposited into the First of America Account in December of 1995) were used to purchase $15,000 of furniture to furnish the new home in Mrs. Scott's name. Based on the absolute control that the Debtor exercised over the movement, investment, and transfer of funds in the Waterhouse Account, the payments that the Debtor made directly to Mrs. Scott

**2.** Although the Debtor had a power of attorney that enabled him to conduct trading activity with respect to the Waterhouse Account, only Mrs. Scott could withdraw money from the Waterhouse Account.

(or for her benefit) were payments of monies that were the Debtor's property.

10. Mrs. Scott, in addition to being the party who used $24,000 of the Transferred Funds for the purchase of the house, and $15,000 for the purchase of new furniture, received monthly account statements for the Waterhouse Account, which statements evidenced the Debtor's trading activities in the account. The monthly statements for the First of America Account further evidenced the deposit by the Debtor of all of his income for December of 1995 into that account. Mrs. Scott had full and complete knowledge of all the Debtor's deposits into, and trading activities with respect to, both the Waterhouse Account and the First of America Account. Mrs. Scott was an active participant in, and beneficiary of, the Debtor's financial transactions.

11. In the year prior to the bankruptcy filing, the Debtor and Mrs. Scott had two automobiles that are in issue here. One was a 1990 Corvette that was initially leased by the Debtor. When the lease expired, Mrs. Scott entered into a financing arrangement to purchase the automobile. The second automobile was a Honda Civic. Mrs. Scott was also the financially responsible party with respect to the Honda Civic. As of April of 1995, both automobiles were titled in Mrs. Scott's name. In that same month, the Debtor used a total of $19,452.57 of his funds to pay off the loans on both automobiles. *See* Defendant's Exhibit 1.

12. During the time that the Debtor transferred the sum of $77,186.84 from the KSI Account to Mrs. Scott, the Debtor was insolvent. The Debtor did not receive any consideration in exchange for the $77,186.84 he transferred to Mrs. Scott.

13. On the date the Debtor filed his bankruptcy petition, he had $5,678.13 in his KSI Account. There was a freeze on the account due to a garnishment. After the filing of the petition, the freeze was released, and the funds became available for use by the Debtor. The Debtor did not disclose the garnishment or the funds in his petition. To date, the Trustee has not been given an accounting by the Debtor as to where the previously-garnished funds are, or to what use they were put by the Debtor.

14. At the time of the filing of the bankruptcy petition, the Debtor had an option to purchase 75,000 shares of the common stock of Insight.

15. In his bankruptcy petition the Debtor:

—failed to disclose his employment with Insight

—falsely reported his annual income for 1995 as $36,000, rather than the $106,000 that was reported on his W–2 issued by Insight

—failed to disclose gross deposits into the KSI Account in 1995 in the amount of approximately $380,000

—failed to disclose the existence of his company KSI, including the company's assets, business activity, income, and inventory

—failed to disclose preferential payments made within 90 days of filing his bankruptcy petition

—failed to disclose various transfers to Mrs. Scott totaling over $96,000

—failed to disclose all of his checking accounts

—failed to disclose an option to purchase 75,000 shares of the common stock of Insight

—failed to disclose the full extent of his assets

—failed to disclose the existence of $5,678.15 of garnished funds

—failed to disclose the power of attorney he exercised with respect to the Waterhouse Account, and his trading activity in the account

Based on the foregoing Findings of Fact, the Court now makes its

## CONCLUSIONS OF LAW

1. The Court has jurisdiction to decide this matter. 28 U.S.C. Section 1334, 28 U.S.C. Section 157.

2. To the extent that any of the foregoing Findings of Fact are Conclusions of Law,

they are hereby deemed to be Conclusions of Law.

3. The Trustee makes several allegations in his Complaint, three of which will be addressed here: first, whether the Debtor should be denied a discharge; secondly, whether any of the transfers the Debtor made prior to his bankruptcy filing are in the nature of fraudulent transfers, and can be avoided pursuant to 11 U.S.C. Section 548(a)(1) and 548(a)(2); and thirdly, whether certain funds subject to garnishment on the date of the bankruptcy filing are property of the estate, and subject to turnover to the Trustee.

### I. *Denial of Discharge under 11 U.S.C. Section 727*

#### (i) *Transfer of Assets with Intent to Hinder, Delay, or Defraud Creditors*

4. Section 727(a)(2) provides that a debtor should be denied a discharge where

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

5. According to *Collier*, "Section 727(a)(2) is intended to prevent the discharge of a debtor who attempts to avoid payment to creditors by concealing or otherwise disposing of assets." 6 *Collier on Bankruptcy*, paragraph 727.02[1] (15th ed.). Before a debtor may be denied a discharge under Section 727(a)(2), the debtor must be found to have acted with an actual (as opposed to constructive) intent to defraud. *Matter of Krehl*, 86 F.3d 737, 743 (7th Cir.1996). "Because direct evidence of a debtor's intent usually will be unavailable, it may be inferred from the circumstances surrounding his objectionable conduct." *Krehl*, 86 F.3d at 743.

6. Here the Court is presented with both direct and indirect evidence that the Debtor acted with the intent to defraud his creditors, or certainly to hinder or delay them. The Debtor testified that he would take money from his KSI Account, transfer the money to Mrs. Scott's First Indiana Account, and then deposit the money in Mrs. Scott's Waterhouse Account. The Debtor further testified that he took those actions in order to avoid collection efforts by the Internal Revenue Service.

7. The Debtor took the position at trial that the funds he transferred to the Waterhouse Account were not his, but were property of his employer, Insight, and for that reason, his actions did not involve a transfer of *his* funds, and did not result in the taking of anything from his creditors that otherwise would have been available to his creditors. The Debtor's position is not convincing, given the overwhelming evidence that both the Debtor and Mrs. Scott treated the funds in issue as if they were, in fact, their funds. The Debtor and Mrs. Scott used the funds, *inter alia*, to pay off automobile loans, to purchase furniture, and to purchase a new home.

8. In addition to the Debtor's direct testimony as to his intent, the circumstances surrounding the Debtor's actions point to the conclusion that the Debtor acted with an intent to hinder, delay, and defraud his creditors. The transfer of monies from the KSI Account, to the First Indiana Account, and then to the Waterhouse Account, is strongly suggestive of a fraudulent intent on the Debtor's part.

9. The Court further finds that the Debtor transferred property of the estate *after* the filing of his bankruptcy petition, with the intent to hinder, delay, and defraud his creditors. The Debtor has never accounted for the $5,678.15 sum that became available to him, after the Debtor's bankruptcy filing caused a garnishment on the KSI Account to be released. Accordingly, pursuant to Section 727(a)(2)(B), the Debtor's discharge should be denied.

10. For all the foregoing reasons, it is the conclusion of the Court that discharge should be denied pursuant to Section 727(a)(2).

### (ii) *Concealment and Destruction of Recorded Information*

11. Section 727(a)(3) provides that a debtor should be denied a discharge where

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

The Trustee argues that the Debtor's discharge should be denied pursuant to Section 727(a)(3), because the Debtor has concealed, or does not have, essentially all of his financial records relating to his company KSI, and has also concealed, or does not have, records that would illuminate his relationship with Insight. According to the Trustee, the Debtor either concealed the records, or never had them, or the records were so incomplete that they were of no benefit to explain his financial affairs.

12. In *Matter of Juzwiak*, 89 F.3d 424 (7th Cir.1996), the Seventh Circuit addressed the denial of discharge under Section 727(a)(3). The Seventh Circuit stated that

[A] discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor....

Section 727(a)(3) requires as a pre-condition to discharge that debtors produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present' .... The provision ensures that trustees and creditors will receive sufficient information to enable them to 'trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions' .... [C]ourts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs.

*Matter of Juzwiak*, 89 F.3d at 427–428 (citations omitted). The Court has substantial information before it that the Debtor has not been forthcoming with respect to the records that he has provided to the Trustee and to the Court, and that much of the information that has been provided has been incomplete.

■ 13. Having reviewed the evidence before the Court, the Court concludes that the Debtor's discharge should be denied pursuant to Section 727(a)(3). The Debtor initially failed to disclose the existence of his business KSI, and has provided virtually no documentation of the financial dealings, sales, gross income, assets, and accounts receivable of the business. The Debtor has failed to provide documentation that would explain the disposition of the approximately $380,000 that was deposited into the KSI Account in 1995; has failed to provide documentation that would explain the disposition of the monies that were in the Waterhouse Account on the date of the bankruptcy filing; and has failed to provide documentation that would explain the disposition of the $5,678.15 that was frozen in an account on the date of the bankruptcy filing, and thereafter released.

14. For all the foregoing reasons, it is the conclusion of the Court that discharge should be denied pursuant to Section 727(a)(3).

### (iii) *Making of a False Oath in Connection with a Bankruptcy Case*

15. Section 727(a)(4) provides that a debtor should be denied a discharge where

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account....

■ 16. In order for a false oath or account to serve a ground for denial of discharge, the false oath must have been knowingly and fraudulently made. *In re Varrasso*, 37 F.3d 760 (1st Cir.1994); *Farouki v. Emirates Bank Intern., Ltd.*, 14 F.3d 244 (4th Cir.1994). The false oath must have related to a material matter. A false oath is material if " 'it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.' " *Mertz v. Rott*, 955 F.2d 596, 598 (8th Cir.1992) (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984)).

17. Here there is a substantial amount of evidence that the Debtor knowingly and fraudulently made false oaths in his bankruptcy petition, and made false statements and material omissions during his examination at the First Meeting of Creditors. *See* Plaintiff's Exhibit 1 [copy of petition]; Plaintiff's Exhibit 2 [tape of First Meeting of Creditors]. The Debtor failed to disclose his employment with Insight. The Debtor stated that his income for 1995 was $36,000; the evidence presented at trial established that the Debtor received a W–2 form from Insight for 1995 that reported 1995 income in the amount of $106,000. The Debtor failed to disclose gross deposits in the amount of $380,543.25 to the KSI account in 1995. The Debtor failed to disclose his business known as Knowledge Systems International. The Debtor failed to disclose transfers he made within 90 days of the filing of his petition, and failed to disclose transfers that he had made to Mrs. Scott. The Debtor failed to disclose his checking accounts. The Debtor failed to disclose an option to purchase 75,000 share of stock of Insight, and also failed to disclose the existence of $5,678.15, which sum was frozen pursuant to a garnishment order on the date of the bankruptcy filing. The Debtor failed to disclose the power of attorney he exercised with respect to the Waterhouse Account held in Mrs. Scott's name, and failed to disclose the trading activity he conducted with respect to the account. Given the weight and number of the Debtor's omissions and misstatements, the Court can only conclude that the Debtor's false oaths in his petition, as well as his false statements and omissions at the First Meeting of Creditors, were made knowingly and fraudulently, and were material in nature.

18. The purpose of Section 727(a)(4)(A) is to

insure that sufficient facts are available to all persons interested in the administration of the bankruptcy estate without requiring investigations or examinations to discover whether the information provided is true.... Under the subsection, the debtor has an obligation to disclose the existence of all assets, even if they are worthless or unavailable.... Debtors cannot escape disclosure under this subsection by claiming that assets omitted are worthless; it is up to the creditors to decide for themselves what assets will be of benefit to them and which will not....

*In re Ingersoll,* 124 Bankr.116, 122 (M.D.Fla. 1991) (citations omitted). Discharge should be denied pursuant to Section 727(a)(4)(A) " 'when the cumulative effect of all falsehoods together evince a pattern of reckless and cavalier disregard for the truth.' " *Ricca–Stroud v. Lopez,* 201 B.R. 943, 947 (N.D.Ill. 1996) (quoting *In re Montgomery,* 86 B.R. 948, 957 (Bkrtcy.N.D.Ind.1988)). Here the cumulative effect of the Debtor's omissions and misstatements points clearly in the direction of denying his discharge under Section 727(a)(4)(A).

19. For all the foregoing reasons, it is the conclusion of the Court that the Debtor's discharge should be denied pursuant to Section 727(a)(4).

## II. *Fraudulent Transfers under 11 U.S.C. Section 548*

20. The Trustee alleges that several of the transfers that the Debtor made prior to the filing of his bankruptcy petition were made with the intent to hinder, delay, and defraud the Debtor's creditors, and are consequently fraudulent transfers. Section 548(a)(1) provides that a trustee may avoid as fraudulent the following transfers:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (B)(i) was insolvent on the date that such transfer was made....

21. The purpose of fraudulent conveyance law "is to protect a debtor's unsecured creditors from unfair reductions in the debtor's estate to which creditors usually look for security." *In re Randy*, 189 B.R. 425, 444 (Bkrtcy.N.D.Ill.1995).

22. A showing of actual harm to creditors is not required to set aside a fraudulent transfer under Section 548(a)(1).

[A]ctual harm is not required; the trustee must show only that the debtor acted with the intent to hinder, delay or defraud creditors. 'While ordinarily there is no reason for a trustee to seek, or a court to exercise its power, to avoid a transfer which has not harmed anyone, it is to be emphasized that fraud may be committed under section 548(a)(1) even though a fairly equivalent consideration may pass to the transferor and even though creditors are merely hindered or delayed.'

*In re Sherman*, 67 F.3d 1348, 1355 (8th Cir.1995) (quoting *4 Collier on Bankruptcy*, paragraph 548.02 (15th ed.1995)).

23. The courts have labeled the type of fraud addressed in Section 548(a)(1) as "actual fraud", and the type of fraud addressed in Section 548(a)(2) as "constructive fraud".

Subsection 548(a)(2) often is called 'constructive fraud' because it omits any element of intent. Subsection 548(a)(1), which condemns transfers made 'with actual intent to hinder, delay, or defraud any entity to which the debtor was … indebted', goes by the label 'actual fraud' because of its intent ingredient.

*Matter of FBN Food Services, Inc.*, 82 F.3d 1387, 1394 (7th Cir.1996).

24. To make a case under Section 548(a)(1) (*i.e.*, actual fraud), "the Trustee must show that the transfers actually took place and that the debtor (not the payee) had 'actual intent to hinder, delay or defraud' his creditors." *In re Randy*, 189 B.R. at 438. The Debtor admitted at trial that he transferred $77,186.84 from his KSI Account to his wife's Waterhouse Account, and did so with the intent to avoid collection efforts by his creditors. Accordingly, the Court concludes that the transfers to the Waterhouse Account were in the nature of fraudulent transfers pursuant to Section 548(a)(1).

25. Where constructive fraud is in issue, several indicia of fraud are relevant:

(a) the lack or inadequacy of consideration,

(b) the family, friendship, or close association relationship between the parties,

(c) the retention of possession, benefit, or use of the property in question,

(d) the financial condition of the parties sought to be charged both before and after the transaction in question,

(e) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors, and

(f) the general chronology of the events and transactions under inquiry.

*Matter of Ayala*, 107 B.R. 271, 274–275 (Bkrtcy.E.D.Cal.1989).

26. Here several of the indicia of constructive fraud are present. For example, the payment by the Debtor in April of 1995, of the two debts owed by Mrs. Scott with respect to the parties' automobiles, appears to be in the nature of a fraudulent transfer. The fact that both cars were titled in his wife's name alone, at a time when the Debtor was under severe financial distress, coupled with the manner in which the two loans were paid in full, points strongly in the direction of an intent on the part of the Debtor to frustrate the collection efforts of his creditors. *Compare In re Craig*, 195 B.R. 443 (Bkrtcy. D.N.D.1996) (holding that discharge should be denied where debtor transferred virtually all of his assets to his wife, and failed to disclose the transfers).

27. For all the foregoing reasons, it is the conclusion of the Court that the transfers from the Debtor to Mrs. Scott in the amounts of $77,186.84 and $19,452.27 were in the nature of fraudulent transfers.

III. *Turnover of Estate Property under 11 U.S.C. Section 541*

28. On the date that the Debtor filed his bankruptcy petition, he had $5,678.15 in his

KSI Account. There was a freeze on the account, due to a garnishment. After the filing of the petition, the freeze was released, and the funds became available for use by the Debtor. The Trustee contends that the $5,678.15 in the KSI Account on the date of the bankruptcy filing is property of the estate, and that accordingly, it should be turned over to the Trustee for distribution to the Debtor's creditors.

29. Pursuant to 11 U.S.C. Section 541(a)(1), "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case". On the date of the petition filing, even though there was a freeze on the KSI Account, the Debtor retained a property interest in the funds in the account. Accordingly, the Debtor's interest in the funds in the KSI Account became property of the estate.

30. Because the funds in issue are property of the estate, the funds (or an amount equal to the funds subject to the freeze on the date of the bankruptcy filing) should be turned over to the Trustee, for distribution to the Debtor's creditors.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that pursuant to 28 U.S.C. Sections 727(a)(2), 727(a)(3), and 727(a)(4), a discharge shall not be granted to James A. Scott a/k/a Tony Scott. Pursuant to 11 U.S.C. Sections 548(a)(1) and 548(a)(2), it is further ORDERED that the transfers in the amount of $77,186.84 and $19,452.27, from James A. Scott a/k/a Tony Scott to Brenda Scott a/k/a Brenda Sue Hanning, are hereby DECLARED to be in the nature of fraudulent transfers, and are avoided. Judgment is entered against James A. Scott a/k/a Tony Scott, and Brenda Scott a/k/a Brenda Sue Hanning, jointly and severally, in the amount of $96,639.11. Judgment is entered against James A. Scott a/k/a Tony Scott, pursuant to 11 U.S.C. Section 541(a), in the amount of $5,678.15; pursuant to 11 U.S.C. Section 542(a), the Debtor is ORDERED to deliver said amount to the Trustee.