**In re XPEDIOR INCORPORATED, et al., Debtors.**

**No. 01 B 14424.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

Oct. 23, 2006.

Matthew T. Gensburg, Greenberg Traurig LLP, Colleen E. McManus, Piper, Marbury, Rudnick & Wolfe, Chicago, IL, Steven H. Newman, Esq., Esanu, Katsky, Kornis & Siger, LLP, New York, NY, for debtors.

## *MEMORANDUM OPINION ON TRUSTEE'S APPLICATION FOR ENTRY OF FINAL ORDERS AND DECREES CLOSING CHAPTER 11 CASES*

JACK B. SCHMETTERER,
Bankruptcy Judge.

Sandra A. Reese, is trustee (the "Trustee") of the Xpedior Creditor Trust, a trust established in these Chapter 11 Bankruptcy cases by Plan confirmation. Pursuant to 11 U.S.C. § 350(a), Fed. R. Bankr.P. 3022 and Local Bankruptcy Rule 3022–1 she has applied for entry of a final order and decree closing the Chapter 11 cases ("Application"). Although Debtors and all creditors and interested parties were noticed and none objected, this matter is so unusual that briefing was requested of counsel on various issues presented and as to court authority to act on the Application. In this extraordinary case, all assets were collected and claims disposed of, all Plan duties were performed by the Trustee, all allowed claims were fully paid with interest and all administrative claims were fully paid or provided for. With no Plan obligations remaining, there remains some $842,000 in surplus against which the Debtors and the former stockholders have no rights to claim, nor do any creditors or other parties in interest ("Surplus Funds" or "Surplus"). That Surplus now held by the Trustee will, pursuant to this opinion and by order separately to be entered, be distributed to various charities.

For such an unusual case and distribution, it is appropriate to detail reasons as to why no one is entitled to the proceeds, and how authority resides in a bankruptcy judge to authorize the payments. It is also appropriate to detail the excellent and efficient work by Trustee and all counsel concerned who performed in the best traditions of the law.

### *JURISDICTION*

This Court has jurisdiction over the Application pursuant to 28 U.S.C. § 1334. Its presentation constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The procedural predicates for relief requested are 11 U.S.C. § 350(a), Fed. R. Bankr.P. 3022 and Local Bankruptcy Rule 3022–1, and Local District Internal Operating Procedure 15(a).

### *NOTICE*

The Trustee certifies that she and her attorneys have provided at least twenty days notice of this Application to: (a) the U.S. Trustee; (b) the Debtors' counsel; (c) the Special Litigation Trustee; (d) counsel for PSINet (preferred stockholder); (e) Poorman Douglas; (f) all parties that requested notice of pleadings in the Debtors' Chapter 11 cases; and (g) all the Debtors' known creditors at their last known addresses.

## UNDISPUTED FACTS AND CASE HISTORY

### I. The Bankruptcy Cases (Pre–Confirmation)

1. On April 20, 2001 (the "Petition Date"), Xpedior Incorporated (No. 01 B 14424), NDC Group, Inc. (No. 01 B 14426), Xpedior America Incorporated (No. 01 B 14427), Xpedior K Incorporated (No. 01 B 14428), Xpedior M Incorporated (No. 01 B 14429), Xpedior S Incorporated (No. 01 B 14430), Xpedior V Incorporated (No. 01 B 14431), and Xpedior W Incorporated (No. 01 B 14432) (collectively, "Xpedior" or the "Debtors") each filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Court").

2. On or about April 30, 2001, the Office of the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Committee"), which was initially comprised of BSP Solutions, Inc., Broadview Holdings LLP, ePlus Group, Inc., Icarian, Inc., Franklin Street Ltd. Partnership c/o Equity Office Properties Trust n/k/a Equity Office Management, L.L.C., Craig Hoddeson, and Karen Myers. Certain initial members of the Committee resigned or were removed during pendency of the pre-confirmation phase of the Debtors' cases.

3. Prior to the Petition Date, the Debtors could not find a buyer interested in acquiring one or more of their companies as a going concern. As a result, the Debtors determined that it would be in the best interests of the bankruptcy estate to liquidate their assets in an orderly fashion. Thus, both prior to and after the Petition Date, the Debtors: (a) sold substantially all their fixtures, computers, furniture, and equipment at their respective offices and headquarters; (b) rejected most of their leases and executory contracts; (c) liquidated certain other miscellaneous assets; and (d) collected some accounts receivable.

4. On or about February 15, 2002, the Debtors and the Committee filed an Amended Disclosure Statement in Connection with Amended Consensual Joint Plan of Liquidation for Xpedior Incorporated, et. al. dated as of January 16, 2002, submitted by the Debtors and the Official Committee of Unsecured Creditors (the "Disclosure Statement"), which is attached as an Exhibit 1 to the Amended Consensual Joint Plan of Liquidation for Xpedior Incorporated, et. al. dated as of January 16, 2002, proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Plan").

5. As of the date of the Disclosure Statement and the Plan, the assets of the Debtors not converted to cash consisted almost primarily of outstanding accounts receivable and claims and causes of action against third parties.

### II. The Bankruptcy Cases (Post–Confirmation)

#### A. The Plan

6. On or about March 28, 2002, there was entered an Order Confirming Amended Consensual Joint Plan of Liquidation (the "Confirmation Order"), which resulted in, among other things, the following:

a. the Debtors' estates were substantively consolidated;

b. the creation of a liquidation trust (the "Trust"), to which all the Debtors' assets were transferred;

c. approval of a Trust Agreement (the "Trust Agreement"), pursuant to which Sandra A. Reese was named Trustee of the Trust and granted authority to, among other things, (i) hire profession-

als to assist with her duties under the Trust Agreement and the Plan,[1] (ii) pursue all causes of action on behalf of the Debtors, (iii) compromise any and all claims asserted against the Debtors' assets, (iv) liquidate the Debtors' remaining assets, and (v) make distributions to the Debtors' creditors in accordance with the Plan;

d. the continuation of the Committee as the "Post–Confirmation Committee," which had the right to consult with the Trustee in accordance with the Trust Agreement and the Plan;[2] and

e. the appointment of Daniel F. Dooley as Special Litigation Trustee (the "Special Litigation Trustee") to investigate, prosecute and resolve, among other things, certain causes of action against Committee members and the Debtors' former officers and directors.[3]

**B. *Organization of the Estates***

7. At the time the Trustee commenced her duties under the Trust, the Debtors' books and records were in disarray and all former employees had left, leaving the Trustee and her Bankruptcy Professionals with little institutional knowledge of the Debtors' affairs. The Debtors' affairs were further complicated due to the fact that Debtors comprised eight companies located from coast to coast, and the Debtors' records had never been integrated. Aided by diligence and skill of the Bank-

ruptcy Professionals, the Trustee was able to reconcile and organize more than 1,360 boxes of documents and decipher and consolidate approximately a half dozen different computerized accounting systems and databases, which databases were disparate and unintegrated. Those initial efforts, in part, laid the foundation for the successful outcome of this case.

**C. *The Status of the Bankruptcy Estate***

8. The Trustee has liquidated all the Debtors' assets. The Trustee and the Special Litigation Trustee have resolved all motions, contested matters and adversary proceedings, including, without limitation, all claim objections, preference actions and causes of action against the Debtors' former officers and directors. In connection therewith, the Trustee and the Special Litigation Trustee accomplished the following results:

a. secured claims were reduced from $2,455,489 to $9,677;

b. priority claims were reduced from $6,523,153 to $1,064,625;

c. general unsecured claims were reduced from $43,498,801 to $9,462,775 (and as reduced were fully paid with interest);

d. several thousand possible avoidance actions were investigated and approximately 98 adversary proceed-

---

1. The Trustee retained both DLA Piper Rudnick Gray Cary U.S. LLP ("DLA Piper") and Katsky Korins LLP ("Katsky Korins") as her primary bankruptcy counsel and Reese Partners, L.L.C. ("Reese Partners" and together with DLA Piper and Katsky Korins, collectively the "Bankruptcy Professionals") as her financial consultants. Several other law firms, accounting firms and other professionals were also hired for specialized matters.

2. The only three remaining Post–Confirmation Committee members are Equity Office

Management, L.L.C. ("EOM"), Craig Hoddeson ("Hoddeson") and Karen Myers ("Myers" and together with EOM and Hoddeson, collectively the "Remaining Committee Members").

3. The Special Litigation Trustee retained Morris Anderson & Associates ("MA") as his financial advisor and Goldberg Kohn Bell Black Rosenbloom & Moritz Ltd. as his bankruptcy counsel ("Goldberg Kohn" and together with MA, the "SLT Professionals").

ings under Sections 547 and/or 548 of the Bankruptcy Code were commenced, resulting in collections totaling $1,542,199; and

e. accounts receivable collections totaled $1,181,810.

9. Also, the Trustee and the Bankruptcy Professionals investigated and pursued various other matters which resulted in miscellaneous receipts and collections totaling $1,039,167 as of June 22, 2006. Those collections came from several sources, including distributions from the Debtors' many international subdivisions (almost all of which were undergoing various forms of liquidation proceedings), domestic and international tax refunds, and distributions from other companies in bankruptcy and investment income.

10. In addition, the Trustee and the Special Litigation Trustee settled the following two substantial matters: (a) the Special Litigation Trustee settled a lawsuit against certain of the Debtors' former officers and directors which resulted in a collection of $575,000 in March and May of 2005; and (b) the Trustee settled a class action suit, in which the Trust was the lead plaintiff, which resulted in recovery of $473,520 (net of attorneys' fees and expenses) in December of 2005.

11. As a result of the foregoing, all secured and priority claims were paid in full and the Debtors' unsecured creditors received a 100% distribution on account of their claims plus interest thereon. General unsecured creditors thereby recovered $2,513,244 in interest in accordance with Section 5.4 of the Plan. Thus, not only have all claims and all litigation been resolved, but the Trustee has also completed all distributions to creditors contemplated by the Plan. Attached hereto as *Exhibit A* is an operating summary, which summarizes, among other things, the distributions made to the Debtors' creditors and the

U.S. Trustee in these Chapter 11 cases. Accordingly, the Debtors' estates and confirmed Plan have been fully administered except for monies reserved to pay final administrative expenses.

12. Notwithstanding the foregoing, as of June 22, 2006, the Trustee is still holding approximately $1,002,875 (the "Remaining Funds") in the estate. The proposed Termination Budget further lists two sources of additional funds: (a) an estimated future distribution from the Chapter 11 bankruptcy estate of HA2003, Inc., et al. (Case No. 02 B 12059 pending in the Bankruptcy Court) in the amount of $18,426; and (b) investment interest in the approximate amount of $11,500. After all remaining administrative expenses are paid and provided for, the Surplus Funds of $842,000 will remain. However, the Plan has been fully accomplished and does not provide direction as to whom the Surplus Funds should be distributed and, as detailed below, all equity interests in the Debtors have been terminated or waived.

13. The Plan further provides that:

If, after payment of all Allowed Claims pursuant to this Plan . . . the *unclaimed distributions* on deposit in the Operating Account equals $15,000.00 or less, the Trustee shall be authorized, without further order of the Court, to donate such sum to the Make–A–Wish Foundation of Northern Illinois. If such amount is $15,000.00 or greater, the Trustee shall make a further distribution to holders of [general unsecured claims] in accordance with the terms of the Plan.

Plan § 6.18(c) (emphasis supplied). That clause referred only to "unclaimed distributions," not to surplus after all Plan payments.

14. Because the Debtors' common stock was cancelled pursuant to the Plan

and PSINet waived its preferred shareholder interest, the remaining funds held by the Trustee over and above those needed to pay remaining administrative expenses constitute a true "surplus" that belongs to no one and are not claimed by anyone. Except for a reference to "unclaimed distributions" in Plan Section 6.18(c), the Plan does not designate to whom Surplus Funds should be disbursed under these circumstances. The Trustee and her attorneys have proposed, after consulting with the U.S. Trustee for this District that those Surplus Funds be donated to charities.

15. Further facts set forth in the Conclusions of Law will constitute additional Undisputed Facts.

### RELIEF REQUESTED

By her Application, the Trustee seeks entry of a final order and decree, substantially in the proposed form submitted: (a) closing and terminating the Debtors' Chapter 11 cases pursuant to Section 350(a) of the Bankruptcy Code and Fed. R. Bankr.P. 3022; (b) discharging the Trustee and the Special Litigation Trustee and releasing the Trustee, the Special Litigation Trustee, the Bankruptcy Professionals, the Special Litigation Trustee ("SLT") Professionals and the Post–Confirmation Committee; (c) authorizing the Trustee to abandon and destroy the Debtors' books and records; (d) approving the termination budget in the form also submitted with the Application (the "Termination Budget"); and (e) deeming the Debtors dissolved without any further action required by the Trustee.

### CONCLUSIONS OF LAW

#### I. Status of the Case

##### A. Final Order and Decree

■ Section 350(a) of the Bankruptcy Code provides that "[a]fter an estate is fully administered and the court has discharged the trustee, the court shall close the case." Fed. R. Bankr.P. 3022 similarly provides that "[a]fter an estate is fully administered in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case."

■ The concept of "fully administered" means "the point when the estate reaches substantial consummation as defined by section 1101(2) of the bankruptcy code." *In re Wade*, 991 F.2d 402, 407 n. 2 (7th Cir.1992). Section 1101(2) of the Bankruptcy Code provides that:

(2) 'substantial consummation' means—

(A) transfer of all or substantially all of the property proposed by the plan to be transferred;

(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

(C) commencement of distribution under the plan.

In addition, courts have directed that the following events should be considered when determining if an estate has been fully administered:

1) when the order confirming the plan has become final, 2) when deposits have been distributed, 3) when payments under the plan have been commenced and 4) when all motions, contested matters, and adversary proceedings have been resolved.

*Wade*, 991 F.2d at 407 n. 2 (citing *In re Mold Makers, Inc.*, 124 B.R. 766, 768–69 (Bankr.N.D.Ill.1990)).

Under any of the foregoing standards, there is little doubt that the Debtors' estates have been "fully administered" in

accordance with Section 350 of the Bankruptcy Code and Fed. R. Bankr.P. 3022. For example, all the Debtors' creditors have received a 100% distribution on account of their claims, plus interest as provided for in the Plan, and all motions, contested matters and adversary proceedings have been resolved by the Trustee and the Special Litigation Trustee. Thus, after all Remaining Funds including Surplus Funds are accounted for, the Court should enter a final order and decrees closing the Debtors' Chapter 11 cases.

## B. *Discharge of the Trustee and others to be Warranted*

 Section 6.12(c) of the Plan provides, in pertinent part, that:

No member of the Post–Confirmation Committee (in such member's capacity as such a member), the Trustee, the Special Litigation Trustee, the Disbursing Agent or any Professional Person or other person employed by the Trustee or the Special Litigation Trustee shall be liable to the Debtors or to any holder of any Claim or Interest, including, without limitation, for errors in judgment or any losses suffered or sustained by Debtors or by such holder of a Claim or Interest unless the same has occurred through willful misconduct.

Section 6.14 of the Plan provides, in pertinent part, that:

From and after the Effective Date, to the fullest extent permitted by applicable law, each of the Trustee's and the Special Litigation Trustee's employees, consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and Professional Persons, shall not have and shall not incur any liability to any Person, including, without limitation, any holder of a Claim, any holder of an Interest, or any parties in interest, from any and all claims, causes of action and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Trustee or the Special Litigation Trustee by the Plan, the Liquidation Trust or any order of the Court entered after the Effective Date pursuant to or in furtherance of the Plan, the Liquidation Trust or applicable law, or otherwise, except for gross negligence or willful misconduct as determined by a Final Order. No holder of a Claim or an Interest, or other party in interest will have or pursue any claim or cause of action against the Trustee, the Special Litigation Trustee, the Liquidation Trust, the Post–Confirmation Committee or their respective members, employees, consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and other Professional Persons, for making payments in accordance with the Plan or for implementing the provisions of the Plan. Any act or omission taken pursuant to the Plan, the Trust Agreement or order of the Court, will be conclusively deemed not to constitute gross negligence or willful misconduct. To the fullest extent permitted by applicable law, the Liquidation Trust will indemnify, hold harmless, defend and reimburse the Trustee, the Special Litigation Trustee, the Post–Confirmation Committee and each of its members employees, consultants, agents, advisors, attorneys, accountants, financial advisors, other representatives and other Professional Persons from and against any and all losses, claims, causes of action, damages, fees, expenses (including, without limitation, attorneys' fees and expenses), liabilities and actions (i) for any act taken or omission made in good faith arising out of implementing or consummating the Plan, the Liquidation Trust or any transaction or omission authorized by the Plan or (ii) for

any act or omission in connection with or arising out of the operations or activities of the Liquidation Trust, except for gross negligence or willful misconduct as determined by Final Order of the Court.

Pursuant to the Plan, the Trustee and the Special Litigation Trustee should therefore be discharged after the Remaining Funds and Surplus Funds are distributed under Court supervision and accounted for. The Trustee, the Special Litigation Trustee, the Bankruptcy Professionals, the SLT Professionals and the Post–Confirmation Committee and their respective directors, officers, employees, partners, members, agents, professionals, and representatives should then be granted a general release from any and all claims, causes of action, damages, liabilities, contentions, controversies, suits, demands and disputes of every kind and nature whatsoever arising from or in any way relating to the Plan or the Trust and any duties carried out or acts taken or not taken pursuant to, relating to, or in connection with the Plan and/or the Trust. At that point, they will have dutifully discharged all of their duties under the Plan and the Trust.

They have certainly acted in good faith throughout this case. Accordingly, the discharge and release approved in the Plan and described herein will then be justified and warranted.

## C. *Abandonment and Destruction of Debtors' Books and Records*

■ Section 6.10 of the Plan provides, in pertinent part, that all the Debtors' books and records:

shall be preserved for so long as may be necessary for the prosecution or defense of any Claims or actions, or any Claim objection filed by the Trustee or the Special Litigation Trustee, after which the Trustee shall be authorized and empowered to abandon and/or destroy said books and records, in the Trustee's sole discretion.

Pursuant to the Plan, the Trustee seeks the Court's authority to abandon and destroy all the Debtors' books and records. Because all the Debtors' assets have been liquidated, all claims against the Debtors have been satisfied, and all litigation has been fully and completely resolved, there exists no business purpose for retaining the Debtors' books and records and the Trustee has determined, in her discretion, that the Debtors' books and records should be abandoned and destroyed. Thus, an order should be entered authorizing the Trustee to abandon and destroy all Debtors' books and records in her possession and to pay any necessary and reasonable costs associated therewith. As is customarily required in this District, notice of the Application has been given to the Internal Revenue Service in the unlikely case that there is governmental interest in those records. No objection to destruction or abandonment was presented.

## D. *The Proposed Termination Budget and Surplus Funds*

■ The Termination Budget summarizes the Trustee's proposed use of the Remaining Funds including the Surplus Funds. The Termination Budget also sets forth the Trustee's estimates for various expenditures needed to finally terminate the Trust and winddown the Trust's final affairs. Pursuant to the Plan (including, Sections 6.2, 6.6, and 7.1 thereof) and pursuant to the Trust Agreement (including, Articles 3, 4, and 5 thereof) the Trustee claims broad discretion to administer and distribute all Remaining Funds including the Surplus Funds in her sole discretion. However, that sole discretion in the Plan applies to her duties in implementing all Plan purposes. Once those purposes and

related tasks are fully completed, both the general principles of law applicable to a trustee holding an unclaimed surplus in trust and the court's responsibilities to supervise distribution thereof under the cy pres doctrine apply, and her discretion is thereby limited. The Plan does not specifically address to whom the Surplus Funds should be distributed. However, the Trustee and her Bankruptcy Professionals have urged donations of those Funds to appropriate charities.

The Plan does provide that "unclaimed distributions" in the amount of $15,000 or less may be distributed to the Make–A–Wish Foundation of Northern Illinois or, if such funds exceed $15,000.00, they should be distributed to the Debtors' general unsecured creditors. Plan § 6.18(c). However, the Debtors' general unsecured creditors have already received a 100% distribution plus full interest on account of their claims. While a small part of the Remaining Funds are attributed to unclaimed distribution, those claimants were sent checks at the addresses supplied by them, but moved or went out of business without supplying new addresses, making it impossible for the Trustee to find them. Under the Plan, their distributions were thereby forfeited and returned to the Trust.

█ Plan § 6–18(c) gives no direct guidance to use of the Surplus Funds. The Trustee and her Bankruptcy Professionals have concluded that the best use of Surplus Funds, after payment of remaining expenses and a reserve for future anticipated expenses as is set forth in a proposed Termination Budget, would be to donate to charities according to the following proposed distribution scheme initially proposed:

a. $200,000 to the Make–A–Wish Foundation of Northern Illinois;

b. $100,000 to each of the three Remaining Committee Members' charities of their choice without Court approval or supervision; and

c. The balance (approximately $342,000) to be distributed to the Trustee's charities of her choice without Court approval or supervision.

That proposal was later modified to:

a. $200,000 to Make–A–Wish Foundation of Northern Illinois;

b. $100,000 distributed in unspecified amounts to four designated organizations serving needs of the justice system; and

c. balance of $542,000 to be distributed at Trustee's sole discretion to a long list of possible charities, without Court approval or supervision.

Reaction from the bench at two hearings made two points. First, it is inappropriate and would be unseeming to authorize any participant in the bankruptcy process to undertake unsupervised control of estate assets, and the court should not delegate judicial authority under the cy pres doctrine to individuals. Second, it is appropriate to include in consideration charitable objects that aid the American justice system and parties caught up in the law who are in need of help. It was further observed from the bench that it would be at least inappropriate for this judge to sign off on any order giving money to foundations or charities as to which this judge sits on Boards or Advisory Boards.

The U.S. Trustee has agreed to support the making of charitable contributions, provided that donations (a) are made to charities that in some fashion benefit children and (b) are not made to a charity whose primary objective is to promote a religious activity.

Given the Trustee's responsibilities for the Surplus Funds under nonbankruptcy precedent pertaining to trusts, and judicial responsibilities and authority over the Surplus Funds held in a trust created under this judicial authority (as discussed more fully below), the proposal to give *carte blanche* authority to committee members and the Trustee to distribute most of the funds is held to be inappropriate and will by order be denied.

However, before considering the request for approval of donations, and given the unusual nature of this case and the Application, at the initial hearing on the Application, the Court directed the following inquiries to counsel and requested briefing:

(a) Whether earlier orders disallowing claims can be reviewed in a Chapter 11 proceeding in light of the apparent surplus.

(b) Whether claims earlier denied for being filed late should be reviewed when there is a surplus in a Chapter 11 proceeding.

(c) Whether cancellation of the common stock pursuant to the Plan and late release of preferred stock rights can be revisited given circumstances of these cases, and if so whether any former stockholders are entitled to remaining funds.

(d) Whether the Surplus Funds should or can be distributed to the corporate Debtors pursuant to applicable non-bankruptcy law.

(e) Whether the Surplus Funds are subject to state escheat or abandoned property laws.

(f) If no parties in interest are entitled to claim these funds, what is the authority and responsibility of a bankruptcy judge to supervise disposition of the Surplus Funds?

## II. The Court May Not Revisit Final, Non-appealable Orders

### A. Doctrines Of Res Judicata And Law Of The Case Preclude Revisiting Orders Disallowing Claims Or The Order Confirming Plan

 Res judicata applies if the following three elements are established: "(1) an identity of the parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits." *Andersen v. Chrysler Corp.*, 99 F.3d 846, 852 (7th Cir.1996). Specifically, "[u]nder res judicata, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.' " *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 180 (7th Cir.1994) (citation omitted). "Res judicata reflects fundamental public policy that there be an end to litigation, which is particularly strong in the bankruptcy context." *Id.; see also Pearlie Knox v. Sunstar Acceptance Corp. (In re Pearlie Knox)*, 237 B.R. 687, 698 (Bankr. N.D.Ill.1999) (same).

 Res judicata applies to orders disallowing claims, even if the objections to such claims were not contested by the claimants. *See Pettibone Corp.*, 40 F.3d at 180. Res judicata also applies to confirmation orders. *Adair v. Sherman*, 230 F.3d 890, 895 (7th Cir.2000) (" 'The law is well settled that a confirmation order is res judicata as to all issues decided or which could have been decided at the hearing on confirmation.' ") (citation omitted); *see also In re NTG Indus., Inc.*, 118 B.R. 606, 610 (Bankr.N.D.Ill.1990) ("A confirmed plan is res judicata concerning issues and claims arising thereunder and establishes a necessary finality by the order of confirmation to the terms of the plan, which binds the debtor, the creditors and the equity interests.").

 " '[T]he doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988). " '[Law of the case] applies as much to the decisions of a coordinate court in the same case as to a court's own decisions.'" *Jarrard v. CDI Telecomm., Inc.*, 408 F.3d 905, 912 (7th Cir.2005) (citation omitted). Like res judicata, "[law of the case] promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Christianson*, 486 U.S. at 816, 108 S.Ct. at 2177 (citation omitted); *see also Jarrard*, 408 F.3d at 912 ("[law of the case] 'is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter.'") (citation omitted).

 Throughout these cases, all rights of the Debtors, creditors, shareholders, and other parties-in-interest have been fully adjudicated on the merits by final, non-appealable orders, including, but not limited to, orders disallowing claims and the order confirming the Plan.[4] Thus, res judicata applies to bar the review of all such claims and interests because: (1) final judgments on the merits have been entered; (2) the claims or causes of action would be the same; and (3) the parties would likewise be the same. The doctrine of law of the case also bars any such review because the Court has already ruled upon the merits of each of the claims and interests and such rulings should continue to govern all issues associated with those claims and interests throughout these cases. Accordingly, there is no basis

in law to revisit now the merits of any orders in these cases disallowing claims and interests, thereby allowing claimants, shareholders or other parties-in-interest to "relitigate" the same claims and/or interests that have already been adjudicated.

Moreover, the fact that these cases were far more successful than originally contemplated does not render meaningless the doctrines of res judicata and law of the case. Nor does the result obtained in these cases nullify the strong public policy, particularly important in the bankruptcy context, of finality. On the contrary, the need for finality is particularly important and applicable in the case at bar to foreclose setting any precedent that would subsequently give creditors and/or shareholders another "bite at the apple" each and every time a trustee recovers funds not originally contemplated prior to the bar date or at the time claims or interests were disallowed or otherwise compromised. An opinion out of the Seventh Circuit Court of Appeals expressed these very concerns in *In re FBN Food Serv., Inc.*, 82 F.3d 1387, 1396–97 (7th Cir.1996).

In *FBN*, the trustee contemplated that, after he recovered a significant amount of unexpected funds for the benefit of the estate, he would allow creditors another opportunity to file claims against the estate even though the bar date had passed. 82 F.3d at 1396. The trustee wanted to give creditors another opportunity to file claims against the estate because he believed that certain creditors might not have filed claims prior to the bar date because they did not believe the debtor had any assets. *Id.* The opinion disagreed and responded as follows:

---

4. As described in more detail below, pursuant to the Plan, all the Debtors' common stock was cancelled.

Creditors had full notice and ample opportunity to make their claims. The process of filing claims frequently precedes the marshaling of assets; if every infusion of cash from an exercise of the trustee's avoiding powers reopened the claims period, corporate bankruptcies could be indefinitely extended (and the expense of administration indefinitely increased). They are long and expensive enough as it is. Filing claims is cheap and easy; when a claim can be filed for an outlay of a few dollars, a change in the estate's assets cannot be a good reason for a second opportunity. 'The Bankruptcy Code does not require much; a simple, one-page claim suffices. Creditors who do not even do that much, on time, forfeit their entitlement to distributions from the estate' ... A creditor's failure to anticipate the trustee's success in recovering additional funds does not establish excusable neglect for belated claims, so the list of claims against FBN's estate must be deemed closed.

*Id.* at 1396–97.

 In addition to the doctrines of res judicata and law of the case, *FBN* likewise forecloses any argument that, because the Debtors' estates have recovered more funds than originally anticipated (i.e., the Remaining Funds), creditors and/or shareholders should be given another opportunity to either (a) file new claims or interests against the Debtors' estates or (b) relitigate their claims or interests that have already been adjudicated by final, nonappealable orders. The rationale and policy considerations expressed in *FBN* are directly applicable to these cases. The *FBN* directive is clear: in the interests of finality and efficiency, creditors should not and cannot be given a second opportunity to obtain recoveries from a bankruptcy

estate merely because a trustee recovered more than originally expected. *See id.* The opinion recognized that to hold otherwise would lead to the indefinite extension of corporate bankruptcies, a result that would greatly undermine the public policy of finality that is particularly important in bankruptcy proceedings. *See id.; see also Pettibone Corp.,* 40 F.3d at 180 (discussing the need for finality in the bankruptcy context); *Pearlie Knox,* 237 B.R. at 698 (same).

It would set a troublesome precedent, and directly contradict the doctrines of res judicata and law of the case and Seventh Circuit precedent, if creditors and former shareholders were allowed a second opportunity to share in the distribution of the Remaining Funds nearly five years after the bar date [5] and after their claims and interests have been fully adjudicated. Based on the foregoing, the orders disallowing claims and the Plan confirmation order should not be revisited. Thus, no further notice need be given to claimants whose claims were disallowed.

### B. *In This Chapter 11 Case, The Court Should Not Revisit Orders Disallowing Late Claims*

 Because Section 103(b) of the Bankruptcy Code states that "[s]ubchapters I and II of chapter 7 of this title apply only in a case under such chapter" and Section 726 is included within subchapter II of Chapter 7, Section 726 should only be applied to cases under Chapter 7. *See In re Husmann,* 276 B.R. 596, 598 (Bankr. N.D.Ill.2002). Thus, late-claims heretofore barred should not be entitled to a "subordinated priority" or receive any distribution from the Debtors' Chapter 11 estate pursuant to Section 726.

---

**5.** The bar date in these cases for filing proofs of claim was September 10, 2001.

In *Husmann*, a Chapter 13 debtor objected to a late-filed claim and sought to have the claim disallowed in its entirety. *Id.* at 597. This court addressed whether the exception for claims filed under Section 726(a)(1)-(3) included in Section 502(b)(9) (applicable to cases under Chapters 7, 11, 12, and 13) could be construed to mean that Section 726 applies in Chapter 13 cases. *Id.* at 598. The opinion concluded that Section 726 did not apply to cases under Chapter 13 because Section 103(b) specifically provides that such section is only applicable to Chapter 7 proceedings. *Id.* The court recognized that the reference to Section 726 within Section 502(b)(9) constitutes an exception applicable solely to Chapter 7 proceedings. *Id.* The opinion reasoned that this conclusion is supported by the goal of a Chapter 7 liquidation (e.g., ensuring that all parties have an opportunity to collect from an estate's limited assets) compared with a Chapter 13 proceeding (e.g., a debtor retaining estate assets in exchange for an agreement to make periodic payments to creditors). *Id.* Thus, " 'if late filed claims are not barred in Chapter 13 actions, it would not be possible to determine with finality whether a Chapter 13 plan satisfies [the requirement to pay creditors what they would receive under a Chapter 7] this standard.' " *Id.* (citations omitted). Accordingly, the court disallowed the late-filed claim in its entirety. *Id.*

Although *Husmann* only addressed the application of Section 726 to a Chapter 13 case, the result should nevertheless be the same in determining whether that section applies in this Chapter 11 liquidation, as Bankruptcy Code Section 103(b) specifically provides that Section 726 only applies in cases under Chapter 7.

*Husmann* is consistent with prior precedent in the Seventh Circuit concluding that Section 726(a)(4) (subordination of certain claims) is not applicable in a Chapter 11 liquidation because Section 103(b) states that Section 726 only applies to Chapter 7 proceedings. *Virtual Network Serv. Corp. v. U.S. (In re Virtual Network Serv. Corp.)*, 98 B.R. 343, 344 (N.D.Ill.1989), *aff'd*, 902 F.2d 1246 (7th Cir.1990). In support of its conclusion and in referring to Section 103, *Virtual Network* stated that "when the judiciary decides a case governed by statute, it resolves a dispute according to a command given by the political branches" and "[c]ourts are not Solomonic councils empowered to revise legislative enactments on the ground that they are ill-conceived." In affirming the District Court, the Seventh Circuit panel opinion made clear that "[s]ection 726(a)(4) is part of Title VII, which provides for straight liquidations, not bankruptcies as in Title XI." *In re Virtual Network Servs. Corp.*, 902 F.2d at 1249; *see also Banco Latino Int'l v. Gomez–Lopez (In re Banco Latino Int'l)*, 310 B.R. 780, 783–84 (S.D.Fla.2004) (agreeing that Section 726 is not applicable to Chapter 11 liquidations and finding that the appropriate standard in determining whether to allow a late-filed claim is governed by Fed. R. Bankr.P. 3003(c) and *Pioneer Inv. Serv. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)), *aff'd*, 404 F.3d 1295 (11th Cir.2005); *In re Dartmoor Homes, Inc.*, 175 B.R. 659, 664 (Bankr.N.D.Ill.1994) (Ginsberg, J.) (in determining whether to allow a late-filed claim, comparing Section 726 with Fed. R. Bankr.P. 3002(c)(2) and stating that "[u]nlike in a Chapter 7 case, a creditor that fails to file a required proof of claim in a Chapter 11 case does not even get a subordinated claim against the debtor.").

All claimants that had claims disallowed on the basis that they were filed late have already had an opportunity to: (a) file timely claims; (b) contest the Trustee's objection to their claims; and (c) ask the

Court to reconsider the orders disallowing their claims. However, these claimants have either taken no such action or were unsuccessful in their efforts. The presence of the Surplus Funds does not constitute a basis to give these claimants another opportunity to seek a distribution from the Debtors' estate. *See FBN*, 82 F.3d at 1396–97. Thus, not only would revisiting orders disallowing late-claims contradict the doctrines of res judicata and law of the case, but there is no basis in law for any requirement at this time that the holders of such claims be invited by special notice to request rights to participate in distribution of the Surplus Funds.

It should be noted that there has been no reason to suppose here that disallowance of late claims in this case was preceded by lack of proper notice required by the Code, Rules, and Constitution 5th Amendment, or that other events might have rendered the process unlawful and unenforceable.

### C. *Reconsideration Of Orders Disallowing Or Reducing Claims On Substantive Grounds Cannot Be Considered Under Fed. R. Bankr.P. 3008 And Bankruptcy Code Section 502(j)*

 While it is true that the Court can reconsider the allowance or disallowance of claims pursuant to Fed. R. Bankr.P. 3008 and Section 502(j) of the Bankruptcy Code, such reconsideration has not been requested and does not appear to be warranted or possible in these cases.

Fed. R. Bankr.P. 3008 provides, in pertinent part, that "[a] party in interest may move for reconsideration of an order allowing or disallowing a claim against the estate." Similarly, Section 502(j) of the Bankruptcy Code provides, in pertinent part, that "[a] claim that has been allowed or disallowed may be reconsidered for

cause." Fed. R. Bankr.P. 9024 provides that Fed.R.Civ.P. 60 governs the reconsideration of orders allowing or disallowing claims, yet it also indicates that the one-year time limitation contained in Fed. R.Civ.P. 60(b) does not apply to orders "allowing or disallowing a claim against the estate entered without contest."

Any reconsideration would have to be based upon Rule 60(b), which provides, in pertinent part, that:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment ...

Trustee certified that all creditors were noticed and none have objected or asserted rights for reconsideration of their claim treatment. However, the Court's inquiry about the Application was concerned with whether claimants whose claims were disallowed ought to be given a specific additional notice and opportunity to make further claims given the presence of the Surplus Funds.

As the Seventh Circuit panel explained in *FBN*, reconsideration based upon unforeseen success in recovering monies is inappropriate. *In re FBN Food Services, Inc. v. River Bank America*, 82 F.3d 1387,

1396 (7th Cir.1996). No authority has been found holding that a trustee's recovery of additional funds following the disallowance of a claim can constitute "newly discovered evidence" under Fed.R.Civ.P. 60(b). Nor are we aware of a case in which a disallowed claim was reinstated on the basis that a trustee subsequently recovered more assets than originally anticipated at the time of an applicable claims bar date.

Because the Surplus Funds cannot form the basis of a motion to reconsider orders disallowing claims, no further notice should be required. An example illustrates the problems with a contrary rule. Should the law be applied to allow claimants to have another "bite at the apple" as a result of unexpected Surplus Funds, the door would be open for future claimants in any case to seek and be granted authority to relitigate claims when a trustee makes a 25% distribution after originally projecting that creditors would only receive 5%. The same problem would be faced with respect to claimants who compromised their claims based on the expectation of a 25% distribution, only later to learn that the distribution would only total 5%. The fact that this is a surplus estate should have no bearing on the analysis because the resulting precedent would be harmful to orderly bankruptcy proceedings and the policy of finality in bankruptcy cases.

Based on the foregoing, there is no basis to reconsider claims that have been disallowed. And, of course, no one has sought to reopen those issues. Consequently, no further notice was or should be required to claimants whose claims have been disallowed by final non-appealable orders throughout pendency of these cases.

**III.** ***All Common And Preferred Stock Interests In The Debtors Were Terminated By The Plan Or Waived***

■ In *In re FBN Food Services, Inc.*, 82 F.3d 1387 (7th Cir.1996), a surplus fund resulted in a Chapter 7 bankruptcy case. In the face of competing claims against the fund as to which the Bankruptcy Code gave no guidance, the opinion observed in words applicable here that "... [o]nce the rules established by the Code have been exhausted, remaining entitlements come from outside bankruptcy, which is to say from state law." *Id.* at 1396. As shown below, the Surplus Funds are not touched by state laws, but even if they were the rights and adjudications under bankruptcy law trump state laws.

■ The Debtors were incorporated in four states (Illinois, Delaware, California, and Texas) whose different business corporation acts might under other circumstances apply. Using the Illinois Business Corporation Act as an example, under 805 ILCS 5/12.30, the following applies to dissolved corporation:

§ 12.30. Effect of dissolution. (a) Dissolution of a corporation terminates its corporate existence and a dissolved corporation shall not thereafter carry on any business except that necessary to wind up and liquidate its business and affairs,

Illinois corporate law continues the existence of a dissolved corporation for a period of five years after it is dissolved, so that the corporation can windup its affairs. *In re Segno Communications, Inc.*, 264 B.R. 501. (Bankr.N.D.Ill.2001).

■ Shareholders have an interest in assets of dissolved corporation. *In re Lipuma*, 167 B.R. 522 (Bankr.N.D.Ill. 1994). Under Illinois law, a corporation's assets upon dissolution belong to its shareholders as tenants in common, subject to rights of creditors and legal claims of third persons. *In re Ratner*, 146 B.R. 211 (Bankr.N.D.Ill.1992).

However, in this case, pursuant to the confirmed Plan, all Common Stock Interests were forever extinguished. Pursuant to express provisions of the Plan, former holders of Common Stock Interests are no longer parties in interest in these cases, and are thus not entitled to further notice or entitled to claim any of the funds remaining in the Trust.

Section 5.6 of the Plan states:

5.6 *Common Stock Interests (Class 4).* Class 4 Interests are impaired by the Plan. Class 4 Interests shall be deemed *cancelled and extinguished* as of the Effective Date. Holders of Class 4 Interests **shall not** (i) receive any distribution on account of their Class 4 Interests, (ii) be a party in interest in the Chapter 11 Cases and (iii) receive any further notices on account of their Class 4 Interests, the Chapter 11 Cases or the Plan. (emphasis added).

Holders of Common Stock Interests therefore had all of their interests "cancelled and extinguished" and are not entitled to further notices or to any distribution in these Chapter 11 cases.

 Notice of hearing on confirmation of the Plan was served on all known holders of Common Stock Interests and such holders had an opportunity to be heard. None of the holders of Common Stock Interests then filed any objection to the Plan and, therefore, they forfeited or waived any right to assert entitlement to possible receipt of any distribution from the Debtors in the event the cases were more successful than originally contemplated. *See Perruquet v. Briley,* 390 F.3d 505, 517 (7th Cir.2004) ("Forfeiture occurs when a party fails to timely assert a defense or an argument."); *In re Krueger,* 192 F.3d 733, 739 (7th Cir.1999) ("An implied waiver may arise where a person against whom the waiver is asserted has pursued such a course of action as to suffi-ciently evidence an intention to waive a right or where his conduct is inconsistent with any other intention than to waive it."); *Ill. RSA No. 3, Inc. v. County of Peoria,* 963 F.Supp. 732, 742 n. 5 (C.D.Ill.1997) ("The consequence of waiver and forfeiture is largely the same: that the party may no longer assert the waived or forfeited right."). Pursuant to the Confirmation Order, the Plan was confirmed. The Confirmation Order became a final order of the Court on or about March 28, 2002 and under the doctrines of res judicata and law of the case as discussed above, the Plan and the Confirmation Order are binding on all persons and entities noticed and preclude any modification or changes thereof.

The remarks of Debtor's counsel in open court at the second hearing are also instructive:

MR. GENSBURG: ... When the case was confirmed, the debtor ceased to exist. I don't have a board of directors who can give me any direction. There are no officers that I know of. The stock was canceled. So effective from the confirmation date, my firm, and me in particular, were not very involved. We provided assistance to the trustee when they needed it and requested it.

* * *

[Court asked his position on the Trustee's motion]

MR. GENSBURG: I will say that I would support the motion, support the distribution. I understand the issues involved. I looked at the issues and the questions raised by the court with interest. I can't tell Your Honor that I researched the responses, though I did look at the responses from the trustees—the trustee, and I think they're well taken.

I will add to the court that when the motion started to come down, I tried get ahold of former general counsel of Xpedior to make sure he was aware of what was going on. I was not successful. But I did get his voice mail, what I think was his voice mail, and was never responded to.

I will also add that my firm, in order to confirm this plan, agreed to a reduction on its administrative claim I think of over 129,000. So obviously we're a party that would be benefitted by revisiting this process. But all the same, I think that the proposal made by the trustee is appropriate, and we would support it, Your Honor.

(Trial Tr., 2–5, Sept. 19, 2006.)

The Debtors' preferred shares were not cancelled under the Plan, and distributions might have been made to the preferred shareholder under Plan § 5.5 after

... (i) payment in full of all Allowed Secured Claims, all Allowed Administrative Claims, all Allowed Priority Claims, and all Allowed Unsecured Claims (including interest calculated as set forth in Section 5.4 herein) and (ii) the expiration of 120 days after the mailing of the final and last distribution to any Creditor.

Plan § 5.5.

However, pursuant to a Stipulation and Agreed Order (the "PSINet Order") dated June 3, 2003, Xpedior's only preferred shareholder, PSINet Consulting Solutions Holdings, Inc. ("PSINet"), expressly waived any and all claims against and interests in the Debtors, including, without limitation, any right to recover any distribution on account of its preferred shares. In addition, the proof of interest filed by PSINet with respect to its preferred shares was expressly expunged pursuant to the PSINet Order. The PSINet Order was part of a settlement in which tens of millions of dollars of claims against PSI-

Net were released. PSINet counsel was noticed with the Application but raised no objection and did not appear.

Thus, pursuant to the PSINet Order dated June 3, 2003, PSINet as the only holder of a Preferred Stock Interest, expressly waived any and all claims against and interests in the Debtors, including, without limitation, any right to recover any distribution on account of its Preferred Stock Interests (as defined in the Plan).

Therefore, former holders of common and preferred stock interests waived or lost all such rights long ago, and none of them were or are entitled to further notice or special rights to claim the Surplus Funds.

## IV. Section 1127(b) of the Bankruptcy Code Prohibits Modification of the Plan or Plan Documents Because the Plan Has Been Substantially Consummated

Both Section 9.4 of the Plan and Section 1127(b) of the Bankruptcy Code expressly prohibit any modification of the Plan now that substantial consummation has occurred. Section 1127(b) of the Code provides in pertinent part:

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and **before substantial consummation** of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. (emphasis added).

Two express limitations in such Section are that a plan may be modified only (i) "before substantial consummation of such plan"; and (ii) by motion of a plan proponent or debtor. Similarly, Section

9.4 of the Plan [6] tracks Section 1127(b) and permits only the Committee to modify the plan prior to substantial consummation. Since substantial consummation occurred back in December 2002 when the Trustee made her first distributions to creditors, no modification of the Plan or the Trust is now permitted.

■ Pursuant to provisions of Section 1127(b), confirmed and substantially consummated plans may not be modified or amended. *See, e.g., Holstein v. Brill,* 987 F.2d 1268, 1270 (7th Cir.1993) (opinion by Judge Easterbrook concluded that post-confirmation amendments would make an end run around the finality of a plan and confirmation order); *In re Joint Eastern and Southern District Asbestos Litigation (In re Johns–Manville Corporation),* 982 F.2d 721, 747–48 (2d Cir.1992) (a change in the plan or any plan documents "violates the fundamental bar of *section 1127(b),* which prohibits modifications of a confirmed and substantially consummated plan of reorganization;" therefore the Court of Appeals overruled the district court's decision to modify the trust created under the plan even though the trust was running out of funds and modification of the trust would have assisted certain beneficiaries); *see also In re Rickel & Associates, Inc.,* 260 B.R. 673 (Bankr.S.D.N.Y. 2001) (held that because the plan had been substantially consummated, neither the plan nor the confirmation order could be amended to provide that shareholders would receive a distribution, even in the event of a surplus estate); *In re Planet Hollywood International, et al.,* 274 B.R. 391, 400 (Bankr.Del.2001) (modification of a plan and confirmation order denied even in light of changed circumstances).

The facts in *Rickel* are analogous to the case at bar and is the only case found involving existence of surplus funds after making all distributions under a confirmed Chapter 11 plan. In *Rickel,* the Debtor ceased operations just prior to its chapter 11 petition, and filed a liquidating plan which tracked the absolute priority rule. 260 B.R. at 675. The relevant provisions of such confirmed plan provided that: (i) Class 4 unsecured creditors would get distributions up to 100% of their claims, plus post-petition interest at 9% per annum; (ii) Class 5 note holders would then get distributions in the unlikely event that Class 4 received payment in full; and (iii) Class 6, the shareholders, would not receive any distributions. Assets of the debtor included warrants in another corporation that the debtor valued at approximately $510,000 at the time of confirmation. Shortly after confirmation, the court approved a sale of those warrants in the amount of $3.525 million. After the sale, the debtor suspected that the buyer made material misrepresentations about the warrants, believed the warrants were worth in excess of $7 million, sued the buyer and, about one year after confirmation, moved to modify the plan to pay any

---

6. Section 9.4 of the Plan states in pertinent part:

"9.4 *Amendments, Modifications and Revocation of Plan.....* After the Confirmation Date and prior to substantial consummation of the Plan as defined in § 1127(b) of the Code, the Committee reserves the right to institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, and such matters as may be necessary to carry out the purposes and effects of the Plan so long as such proceedings do not materially adversely affect the treatment of holders of Claims under the Plan; provided, however, that prior notice of such proceedings shall be served on Creditors who may be materially adversely effected by any such modification of the Plan in accordance with the Bankruptcy Rules or order of the Court."

surplus funds to the shareholders. *Id.* at 676. That motion was denied.

*Rickel* held that Code Section 1127(b) provides the sole means to modify a confirmed plan. Since the plan had been substantially consummated, "the literal terms of § 1127(b) bar any effort to modify the [p]lan, as do the express terms of the [p]lan." *Id.* at 677. The opinion rejected debtor's contention that the court could use equitable powers under Section 105(a) of the Bankruptcy Code or the provisions of Fed.R.Civ.P. 60(b) to side step the limitation on modification of a substantially consummated plan imposed by Section 1127(b) of the Bankruptcy Code:

> [C]onfirmation is the equivalent of a final judgment in a civil litigation. 7 *Collier* ¶ 1127.04[3], at 1127–9. Section 1127(b) reinforces the principles of finality by preserving the rights bought and paid for under the plan. *In re Antiquities of Nevada, Inc.*, 173 B.R. 926, 928 (9th Cir. BAP 1994); *In re U.S. Repeating Arms Co.*, 98 B.R. 138, 140 (Bankr. D.Conn.1989); *In re Charterhouse, Inc.*, 84 B.R. 147, 152 (Bankr.D.Minn.1988); *see In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir.1994); *In re Diamond Mortgage Corp.*, 105 B.R. 876, 880 (Bankr.N.D.Ill.1989) ("[c]onfirmation of a plan in effect sets the plan in stone unless the proponent chooses to alter it before it is substantially consummated"). 260 B.R. at 677.

\* \* \*

A bankruptcy court cannot exercise its equitable powers outside of the confines of the Bankruptcy Code, or disregard its specified commands. *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *FDIC v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir.1992); *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 995 (2d Cir.1990), *cert. denied,* 502 U.S.

808, 112 S.Ct. 50, 116 L.Ed.2d 28 [(]1991). Consequently, it cannot modify a plan under § 105(a), and produce a result at odds with the specific provisions of § 1127(b). *In re Ionosphere Clubs, Inc.,* 208 B.R. [812,] at 816–17 [(S.D.N.Y.1997)]; *In re Northtown Realty Co., L.P.,* 215 B.R. 906, 912 (Bankr. E.D.N.Y.1998); *Carter v. Peoples Bank & Trust Co. (In re BNW Inc.),* 201 B.R. 838, 847 (Bankr.S.D.Ala.1996); *In re Stevenson,* 138 B.R. 964, 966–67 (Bankr.D.Idaho), *modified on the grounds,* 148 B.R. 592 (D.Idaho 1992); *In re Charterhouse, Inc.,* 84 B.R. at 154; 7 Collier ¶ 1127.04, at 1127–7.

Nor can it do so under Fed.R.Civ.P. 60(b). While a court can modify a confirmation order under Rule 60(b), see *In re 401 East 89th Street Owners, Inc.,* 223 B.R. 75, 79 (Bankr.S.D.N.Y.1998); 8 Collier ¶ 1144.07, at 1144–13, the Rules cannot provide a remedy that the Bankruptcy Code has substantively foreclosed. *In re Fesq.* 153 F.3d 113, 116 (3d Cir.1998), *cert. denied,* 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999). Hence, Rule 60(b) cannot be invoked to bypass § 1127(b). *Cf. In re Newport Harbor Assocs.,* 589 F.2d 20, 23 (1st Cir.1978) (debtors cannot circumvent six month statute of limitations governing revocation of Chapter XI plan through invocation of court's general equitable powers or Fed.R.Civ.P. 60(b)[)]. (emphasis added).

*Id.* at 678.

For the same reasons as were expressed in *Rickel,* neither the Plan nor the Trust here can be modified, even though a surplus now exists.

## V. *The Surplus Funds Are Not Unclaimed Property And Not Subject To Any State Laws*

At the July 28th hearing, the Court asked whether the Surplus Funds

are unclaimed or abandoned property subject to disposition under state law. It is now concluded that such laws are not applicable.

■■■■ Under state law, as typified in Illinois (although Illinois is only one of the several states potentially involved), "abandoned" property may escheat to a designated governmental entity if after a number of years no rightful owner appears. 1 Ill. Law and Prac. Abandoned and Lost Property § 5 (2006). Under the Illinois Escheat Act, if any person dies owning any personal property without any legacy, and leaving no known heirs or representatives capable of inheriting the same, such personal estate shall escheat as provided in the Probate Act of 1975 as amended. 755 Ill. Comp. Stat. Ann. 20/1 (2006). In Illinois, personal property may thereby escheat to the county, not to the state. *See Boghosian v. Mid City Nat'l Bank of Chicago,* 167 N.E.2d 442, 25 Ill.App.2d 455 (1960). Personal property that escheats is administered by the County Collector. *Application of County Collector,* 79 Ill. App.3d 151, 34 Ill.Dec. 717, 398 N.E.2d 392 (1979).

The surplus funds in this case in no way resulted from the death of some intestate decedent owning any part of the Surplus Funds but lacking heirs.

Again using Illinois law as illustrative, under the Illinois Uniform Disposition of Unclaimed Property Act ("Act") the State Treasurer generally administers most responsibilities. Property presumed abandoned under the Act must be reported and remitted to the Treasurer. 15 Ill. Comp. Stat. Ann. 505/0.02–0.06 (2006).

Portions of the Act, 65 ILCS § 1025.1 et. seq., that might intuitively be considered applicable are these:

1025/6. Property distributable in course of voluntary dissolution; presumption of abandonment

§ 6. All intangible personal property distributable in the course of a voluntary dissolution of a business association, banking organization, or financial organization that is unclaimed by the owner within 2 years after the date for final distribution, is presumed abandoned.

1025/7. Property held in fiduciary capacity; presumption abandonment; deductions

§ 7. All intangible personal property and any income or increment thereon, held in a fiduciary capacity for the benefit of another person is presumed abandoned unless the owner has, within 5 years after it becomes payable or distributable, increased or decreased the principal, accepted payment of principal or income, corresponded in writing concerning the property, or otherwise indicated an interest as evidenced by a memorandum on file with the fiduciary.

\* \* \*

1025/7a. Active express trusts

§ 7a. The provisions of this Act shall not apply to an active express trust. As of January 1, 1998, this Section shall not be applicable unless the Department has commenced, but not finalized, an examination of the holder as of that date and the property is included in a final examination report for the period covered by the examination.

§ 8.1. Property held by governments.

(a) All tangible personal property or intangible personal property and all debts owed or entrusted funds or other property held by any federal, state or local government or governmental subdivision, agency, entity, officer of appointee thereof, shall be presumed

abandoned if the property has remained unclaimed for 7 years.

\* \* \*

1025/9. Property not otherwise covered by Act; presumption of abandonment

§ 9. All personal property, not otherwise covered by this Act, including any income or increment thereof that the owner would be entitled to and deducting any lawful charges that has remained unclaimed by the owner for more than 5 years is presumed abandoned. . . .

However, the Surplus Funds conclusively belong to the Trust, not to any individual or business that has abandoned it. Section 6.18 of the Plan specifically defines "unclaimed" distributions as distributions that are either returned or not cashed within 120 days of the date of distribution.[7] A few claimants who failed to cash their checks have moved or gone out of business without supplying a change of address. Thus, they could not be found. Under the Plan, they thereby forfeited their distributions. That money became part of the Trust. No shareholders, creditors, or any other person is entitled to any of the Surplus Funds. Accordingly, the Surplus Funds cannot be considered "unclaimed" property as defined under the Plan and therefore cannot be unclaimed property under state law.

 Indeed, state unclaimed property and escheat laws are not applicable or even relevant because such laws apply only to property whose owner cannot be located or fails to claim such property within a specified time. That is not the situation on hand as to the Surplus Funds. In *Canel v. Topinka*, 288 Ill.Dec. 623, 212 Ill.2d 311, 818 N.E.2d 311 (2004), the Illinois Supreme Court concluded that the purpose of the Uniform Disposition of Unclaimed Property Act is to give custody of only certain enumerated types of property when the owner has not claimed such property and cannot be located. *See also* 12 Del. C. § 1160, titled "Escheats" (limiting escheat to abandoned property defined, in relevant part, as "(b) any money or property held by the Court of Chancery for distribution to a creditor, owner or shareholder and or to which **no claim or request for payment has been made by the person appearing to be entitled thereto** within 5 years . . .") (emphasis added); *see also* California Code of Civil Procedure § 1300(c) (escheat defined, in pertinent part, as "the vesting in the state of title to property, the whereabouts of whose owner is unknown or whose owner is unknown or which a known owner has refused to accept, whether by judicial determination or by operation of law."); California Code of Civil Procedure § 1500 et seq. (providing for escheat to the state when an apparent owner cannot be located for statutory periods in connection with unclaimed payments on money orders, travelers checks and similar instruments); and Texas Property Code, Tit. 6, § 71 et seq. (providing for escheat of unclaimed property in connection with abandonment of property where the existence and loca-

---

7. Section 6.18 of the Plan provides in relevant part: "6.18 *Undeliverable and Unclaimed Distributions.* (a) Unclaimed and undeliverable distributions shall include: (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (ii) checks (and the funds represented thereby) which have been issued to the holder of an Allowed Claim or Allowed Interest in accordance with the Plan but which have not been presented for payment within one hundred and twenty (120) days after the date of such checks, and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a complete or correct mailing address."

tion of the owner is unknown to the holder of the property). Here, the subject funds have not been deposited with any state court. All possible owners or recipients have been identified and have all been paid and cashed their distributions. As to those few claimants who could not be found, the Plan itself provided for their rights to be forfeited and the funds offered to them became part of the Trust funds no longer belong to them.

The Surplus Funds are truly "surplus" funds and are not "unclaimed" by any rightful owners thereof. Finally, the Supremacy Clause of the United States Constitution is a dispositive reason why state laws do not apply. Section 347(b) of the Bankruptcy Code provides in relevant part that "... property remaining unclaimed ... in a case under chapter 9, 11, or 12 of this title ... becomes property of the debtor or the **entity acquiring** the assets of the debtor under the plan, as the case may be." (emphasis added). The Trust is an "entity" under Section 101(15) of the Bankruptcy Code. As set forth above, the Trust acquired all of the Debtors' assets under the Plan. Accordingly, pursuant to Section 347(b) of the Bankruptcy Code, the Trust, as the acquirer of the Debtors' assets under the Plan, now holds the Surplus Funds free from any state claims. Section 347(b) supersedes state unclaimed property laws and therefore those laws are not applicable to distributions under a confirmed Chapter 11 plan. *See, e.g., State of Arkansas v. Federated Dep't Stores,* 175 B.R. 924, 932 (S.D.Ohio 1992) ("In enacting § 347(b), Congress specifically intended to overrule prior judicial precedent that allowed states to escheat unclaimed funds issued as part of a final distribution of an estate pursuant to a court-confirmed plan of reorganization."); *see generally Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 2294, 147 L.Ed.2d 352 (2000) ("state law is naturally

preempted to the extent of any conflict with a federal statute."); *Hillsborough County, Florida v. Automated Med. Labs.,* 471 U.S. 707, 713, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) ("state law is nullified to the extent that it actually conflicts with federal law."); *In re TLI, Inc.,* 213 B.R. 946, 956 (N.D.Texas 1997) (District Court reversed a bankruptcy court's decision and found that pursuant to Section 347(b) unclaimed funds did not escheat). *See also In re Goldblatt Bros., Inc.,* 132 B.R. 736, 738 (Bankr.N.D.Ill.1991) (Section 347(b) furthers the very important Congressional goals of ensuring finality, judicial economy and the avoidance of disruptive, wasteful litigation).

█ Furthermore, the Plan specifically dealt with administration of the Debtors, the assignment of the Debtors' property to the Trust, the creation and administration of the Trust and distributions under the Plan and the Trust. Section 6.18 of the Plan addressed "Unclaimed Distributions," and spelled out mechanics of when distributions could be deemed unclaimed. It specified that unclaimed funds would remain in the Plan trust for further distribution to others by the Trustee. Federal court orders enforcing a federal statute (such as the Bankruptcy Code) supersede any contrary state law. *See, generally, Brinn v. Tidewater Transp. Dist. Comm'n,* 242 F.3d 227, 233-34 (4th Cir.2001) ("A state statute that thwarts a federal court order enforcing federal rights 'cannot survive the command of the Supremacy Clause.' "). Accordingly, the provisions of the Plan and the Trust superseded any state laws. The Surplus Funds are not controlled under state law, but remain in the Trust for distribution by the Trustee.

Accordingly, for all of the foregoing reasons, state laws, including abandoned property and escheat laws are neither rele-

vant nor applicable to the Surplus Funds, and no notice was or is required to be given to any state agencies or legal representatives of the several states in which the Debtors were incorporated.[8]

## VI. All Surplus Funds Belong to the Trust Under Trustee Custody And Subject To Court Supervision To Apply The Cy Pres Doctrine And To Wind Up The Trust

### A. The Surplus Funds Belong To The Trust Under Trustee Custody

The Plan provided for extinguishment of any and all shareholders rights and transfer of all of the Debtors' rights and assets to the Trust, which were to be administered by the Trustee in her discretion to carry out Plan provisions.

Relevant provisions of the Plan follow:

6.2 *Liquidation Trust.* On the Effective Date, a grantor's trust shall be established in accordance with the Trust Agreement. On the Effective Date, the Debtors shall be deemed to have transferred all Assets to the holders of Allowed Claims and Allowed Interests. The holders of Allowed Claims and Allowed Interests shall be deemed to transfer the Trust Assets to the Liquidation Trust. The Trustee of the Liquidation Trust shall be responsible for liquidating and administering the Trust

Assets and for all distributions under the Plan. On the Effective Date, the Trustee shall become the appointed representative of the Debtors' estate in accordance with 11 U.S.C. § 1123(b)(3). (emphasis added).

6.7 *Trust Assets.* On the Effective Date, the Debtors shall be deemed to have transferred to the holders of Allowed Claims, and the holders of Allowed Claims shall be deemed to have transferred to the Liquidation Trust, for and on behalf of, and at the request of the beneficiaries of the Liquidation Trust, all of the Assets, including, without limitation, the following: (a) all Causes of Action, (b) all of the Debtors' claims, rights and defenses, including, without limitation, set off rights, arising out of or directly related to any executory contract rejected by the Debtors or by the terms of this Plan, against the other party to such contract, (c) any defenses and counterclaims of the Debtors to any Claim Filed or asserted against the Debtors' estates, except to the extent related to, or affecting, an executory contract, liability or obligation assumed by the Debtors and assigned to a third party purchasers, (d) the proceeds held by the Debtors from any asset sales plus all accumulated interest, (e) all other cash held by the Debtors on

---

8. The parent corporation of the Debtors was Xpedior Incorporated, a Delaware corporation. The other subsidiary Debtors were NDC Group, Inc., a Delaware corporation, Xpedior America Incorporated, a Delaware corporation, Xpedior K Incorporated, a Delaware corporation, Xpedior M Incorporated, an Illinois corporation, Xpedior S Incorporated, a California corporation, Xpedior V Incorporated, a Texas corporation, and Xpedior W Incorporated, an Illinois corporation. Accordingly, the Debtors were organized under the laws of Delaware, Illinois, California and Texas and the laws of such states would be the applicable state law if laws were found to be

applicable. In addition, under *The State of Delaware v. The State of New York,* 507 U.S. 490, 113 S.Ct. 1550, 123 L.Ed.2d 211 (1993), the state of incorporation is one basis for resolving interstate disputes over escheat claims. While the parent Debtor was a Delaware entity, the Debtors were substantively consolidated thereby further scrambling the Debtors' assets, we are not aware of any cases addressing which state law would apply in such situation. If state escheat laws were potentially applicable, the door would be opened to further and endless litigation among the relevant states, preventing the finality of the Plan and bankruptcy process.

the Confirmation Date, and (f) all assets not otherwise transferred pursuant to an order of the Court prior to the Confirmation Date. The transfer and assignment of the Trust Assets to the Liquidation Trust pursuant to this Section 6.7 of the Plan shall be automatically effective as of the Effective Date and upon execution of the Trust Agreement by the Debtors, the Trustee and the Special Litigation Trustee.

7.1 *Assignment of Assets.* All of the Assets are hereby preserved, retained, and assigned by Debtors and their estates to the Liquidation Trust, for the benefit of the holders of Allowed Claims entitled to distribution under the Plan. The Trustee is exclusively authorized and empowered to [take] (*sic*) any action, in his/her sole discretion, necessary and/or appropriate to collect, preserve, liquidate or dispose of the Assets, subject to Section 6.4 [9] of this Plan. (emphasis added).

Accordingly, on the Plan Effective Date, the Debtor entities had no rights whatsoever in the assets, and also had no officers and no shareholders. The Plan by its express terms assigned company rights and assets to the Trust and provided that the Trustee is "exclusively authorized" in ¶ 7.1 to, liquidate and dispose of the Trust Assets in her "sole discretion." However, ¶ 7.1 refers to her authority over assets "for the benefit of the holders of Allowed Claims entitled to distribution under the Plan." She has exercised her discretion in connection with those claims. However, the Plan did not provide for disposition of any Surplus Funds remaining after all Plan tasks were completed, and therefore she was not given and does not now have "sole discretion" with respect thereto.

The Trustee therefore goes too far in asserting that only she has authority to elect how to dispose of the Surplus Funds. Her discretion under the Plan was to carry out that Plan. The Plan and the Trust have a number of express grants of exclusive authority to the Trustee to administer her duties under the Plan. *See, e.g.,* Section 7.1 of the Plan quoted above. Additional provisions include, Section 6.2 of the Plan ( ... "the Trustee of the Liquidation Trust shall be responsible for ... all distributions ..."); Section 6.6 of the Plan ("The Trustee shall have full authority ... to administer the Trust Agreement, including, without limitation, ... to make distributions"); Section 6.8 of the Plan ("Without the necessity of further [Bankruptcy] Court approval ... the Trustee shall have the following powers ... (b) the power to make distributions ... (f) ... provide for distribution of the proceeds [of the Assets] ... and (g) such other powers ... as may be necessary and proper to carry out the provisions of the Plan."); and Section 3.3 of the Trust (" ... the Trustee need not obtain the order or approval of any court, including, without limitation the Court, in the exercise of any power or discretion conferred under the Plan or hereunder or account to any court, including without limitation, the Court ..."). But those provisions all apply by their terms to her powers to carry out the confirmed Plan. That Plan is silent as to the possibility of Surplus Funds, so the Plan terms do not guide their distribution. She therefore falls under supervisory authority of the Court over this surplus trust as discussed below.

**B.** *Duties of Trustee and Court in Terminating Trust*

██ While a bankruptcy judge has some equitable tools useful to implement

9.

authority held by that judge in bankruptcy cases, that judge cannot claim to have the full range of equitable powers held by a state court of equity or an Article III Court of general jurisdiction. However, the equitable tools found under 11 U.S.C. § 105(a) can be exercised to carry out bankruptcy duties and jurisdiction. *In re Mercury Finance Co.*, 240 B.R. 270, 277 (N.D.Ill.1999). *See also* Michael D. Sousa, *Equitable Powers of a Bankruptcy Court: Federal All Writs Act and § 105 of the Code*, 25 Am. Bankr.Inst. J. 28 (2006).

The District Court, and the Bankruptcy Judge by Local Rule assignment, has exclusive jurisdiction over "property of the estate" in a Chapter 11 bankruptcy case. *See* 28 U.S.C. § 1334(e)(1), and 28 U.S.C. § 157, and also Local District Internal Operating Procedure 15(a). In a Chapter 11 bankruptcy case, property of the estate revests in the debtor upon plan confirmation unless the plan provides otherwise. 11 U.S.C. § 1141(b). In this case, the Debtors dissolved and stockholders lost all of their rights upon Plan Confirmation, so the plan clearly did not allow for revesting of estate property in the non-existent Debtors. Since the Surplus Funds cannot revest in the Debtors, it remains property of the estate under bankruptcy court jurisdiction.

All beneficiaries of the Plan Trust have been paid and no one has rights to the Surplus Funds, so neither the Plan in this case nor bankruptcy law provide guidance to the Trustee or Court as to distribution of those Funds. Therefore, law and precedent generally applicable to winding up of trusts must provide that guidance. As earlier noted when bankruptcy law does not present the answer to property ownership or disposition, the answer may be found in state law. *In re FBN Food Services, Inc.*, 82 F.3d 1387, 1396-97 (7th Cir.1996).

Generally, courts will assist a trustee in the due performance of trusts. *In re Village of Mount Prospect*, 167 Ill. App.3d 1031, 1037, 118 Ill.Dec. 667, 522 N.E.2d 122, 125 (1988). A trustee may therefore seek assistance from the court in the management and execution of a trust, and may submit to the court a petition for instructions where doubt exists concerning trustee power or duties. 35 Ill. Law and Prac. Trusts § 87 (2006). The Application by the Trustee in this case, to extent it applies to the Surplus Funds, is a request for directions to enable windup of the trust.

There are many circumstances that will cause termination of a trust, including revocation or modification by the settlor, expiration of the period for which the trust was created, or conveyance by the trustee to or at the direction of the beneficiary or by other terms of the instrument. *Chicago Title and Trust Co. v. Steinitz*, 288 Ill.App.3d 926, 932, 224 Ill. Dec. 354, 681 N.E.2d 669 (1997) (citing Restatement (Second) of Trusts §§ 330-43 (1959)). The trust ordinarily does not automatically terminate merely because the time for distribution has arrived; it is terminated only when the trustee has fully conveyed and accounted for all the trust property. 4 Scott on Trusts § 344 (4th ed.2001).

But termination of the trust is required when all purposes of the trust have been fulfilled. *Fox v. Fox*, 250 Ill. 384, 95 N.E. 498 (1911). A trustee's duties continue until the trust beneficiaries have received all that is due to them under the trust. *Wheeler v. Queen*, 132 N.C.App. 91, 97, 510 S.E.2d 195, 199 (1999). After that, the trustee has a fiduciary duty to wind up the trust which duty extends until the remaining trust assets are distributed. *In re Spengler*, 228 Wis.2d 250, 262, 596

N.W.2d 818, 824 (Ct.App.1999); *see also* 76 Am.Jur.2d Trusts § 332.

### C. *Cy Pres Doctrine to be Applied*

■ Under the cy pres doctrine, once the original intent of the trust becomes impossible or has been satisfied, the court will direct a management or disposition of trust assets that is legal and possible.

"Historically, the cy pres concept was fairly limited and restricted to the closest comparable alternative to the original purpose for which the funds in question had been designated. The trust would fail unless the dominant purpose could be carried out, but incidental requirements that became impossible or impracticable could be avoided through the application of cy pres." *Superior Beverage Co., Inc. v. Owens–Illinois, Inc.,* 827 F.Supp. 477, 478 (N.D.Ill.1993).

■ The cy pres doctrine has since evolved into a flexible tool that allows a court to use its authority to make funds available to public interest, charitable, educational and other public service organizations. *In re Scouring Pads Antitrust Litigation,* No. 93 C 6594, 1995 WL 290242, at *1 (N.D.Ill. May 11, 1995). "Funds remaining in antitrust cases have been awarded to law schools to support programs having little or no relationship to antitrust law, competition, or the operation of our economy." *Superior Beverage Co., Inc. v. Owens–Illinois, Inc.,* 827 F.Supp. 477, 478 (N.D.Ill.1993) (where the surplus arose in an antitrust case):

> [W]hile use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and courts' broad equitable powers now permit use of funds for other public interest purposes by educational, charitable, and other public service organizations, both for current programs or, where appropriate, to constitute an endowment and source of future income for long-range programs to be used in conjunction with other funds raised contemporaneously.

*Id.* at 479.

### D. *Procedure for Recommending Distribution of Surplus Funds*

■ The Trustee and her counsel have proposed distribution of a substantial grant to the Make–A–Wish Foundation which was mentioned in the Plan, plus several justice-related foundations. However, they also ask that all authority to disburse the bulk of remaining Surplus Funds be delegated originally to the Trustee and members of the Creditors Committee, more lately only to the Trustee for donations at her discretion.

■ It would not for many reasons be appropriate for the Court to delegate responsibility for choice and distribution of the Surplus Funds as requested. Exercise of the cy pres doctrine is a judicial function which should not be delegated to individuals to make donations to objects of their personal interest without court guidance or standards.

Other judges faced with a similar question as to procedure to be followed to donate unclaimed funds have used interesting devices.

In *Scouring Pads Antitrust Litigation,* No. 93 C 6594, 1995 WL 290242 (N.D.Ill. May 11, 1995), Judge Marovich had a bit over $150,000 to distribute. He received information and requests for grants from several sources. He selected from among those requests the beneficiaries of the surplus unclaimed funds in his case.

In *Superior Beverage Company v. Owens–Illinois, Inc.,* 827 F.Supp. 477 (N.D.Ill.1993), Judge Will had responsibility for a substantial surplus of unclaimed funds as to which applications were invited

from many worthy groups. The judge selected which groups should receive grants from available funds.

While the Trustee here lacks the discretion over Surplus Funds that her counsel has asserted on her behalf, her opinion and that of her counsel should be given respectful deference at least to her wish to direct a substantial part of the Funds for benefit of children in some way. These professionals did the work that bought about a successful result in the case, and that work created the Surplus Fund; their suggestions for its use are important.

On the other hand, consideration should also be given to our obligation as lawyers and judge to consider needs of the justice systems both federal and state in the community and nation for assistance to adults as well as children in need of service they cannot pay for. See *Superior Beverage* and *Scouring Pads* for examples of needs that judges is those cases sought to alleviate. As lawyers and judges outreach in an increasing effort to aid in the improvement of justice, the Surplus Funds could supply an important resource. This should certainly be part of our professional awareness and effort.

To aid the Court and parties in analysis of an acceptable plan of distribution, applications for grants might be solicited. Alternatively, the Court has discretion to invite a knowledgeable professional to accept appointment as *amicus curia*[10] to serve *pro bono* in cooperation with Trustee and her counsel and jointly in cooperation with them to prepare a list of proposed grantees and specified amounts under the following guidelines (but without the *ami-*

*cus* performing legal services or employing counsel at expense of the estate):

1. To prepare a specific list of proposed grantees and grant amounts totaling $842,000, such list to be incorporated into an order of court and an amended Termination Budget to be approved. In that regard, weight is to be given to:

 a. The recommendation of Trustee and her counsel to give major gifts for the benefit of children;

 b. The many needs of parties in need of help or services related to the bankruptcy system of which we are a part;

 c. The many needs of persons in need of services involved in other aspects of justice in our county, state, and nation; and

 d. Possible use of donations as seed grants to stimulate new activities that the donee is willing and able to fund in the future.

2. Each proposal for grant to a specified donee will be accompanied by information as to:

 a. Good historical fiscal management with low proportionate use of donations for administrative functions and high proportionate use for programs.

 b. Absence of historical problems in formal management or investigations by any governmental agency to the extent that can readily be ascertained.

 c. Governance by a responsible and active board.

---

10. *See Martinez v. Capital Cities,* 909 F.Supp. 283, 286 (E.D.Pa.1995) and *U.S. v. Davis,* 180 F.Supp.2d 797, 799–800 (E.D.La.2001) for discussions of Court's authority to appoint *amicus.*

d. Historical data and details on extent of services performed and numbers of persons served annually.

e. Record, if any, of favorable or adverse publicity relating to it or its board members.

3. The following should not be recommended:

Any entity as to which this Judge is on the Board or Advisory Board, because it would be unseeming and perhaps improper for this Judge to order such a donation.

The case will be set for further status on notice.

Exhibit A

### Xpeditor Creditor Trust Operating Summary

| Adversary Proceedings | | |
|---|---|---|
| Avoidance Actions | | 98 |
| Accounts Receivable Actions | | 7 |

| Claims | | |
|---|---|---|
| Claims Filed | | 543 |
| Claims Allowed | | 219 |
| Priority claim payments—Distribution % | | 100% |
| Priority claim payments—Amount | $ | 1,064,625 |
| Secured claim payments—Distribution % | | 100% |
| Secured claim payments—Amount | $ | 9,677 |
| Unsecured claim payments—Distribution % | | 100% |
| Unsecured claim payments—Amount | $ | 9,462,775 |

| Interest Payments on Claims | | |
|---|---|---|
| Interest Payments 9%—Distribution % | | 100% on qualifying claims |
| Interest Payments 9%—Amount | $ | 2,513,244 |

| Collections | | |
|---|---|---|
| Accounts Receivable Collections | $ | 1,181,810 |
| Preference Collections | $ | 1,542,199 |
| D & O—Gross Collections | $ | 575,000 |
| Class Action Settlement—Net Collections | $ | 473,520 |
| Other Collections | $ | 1,039,167 |

| Expenses | | |
|---|---|---|
| Commissions | $ | 331,993 |
| US Trustee Fees | $ | 68,250 |
| Taxes | $ | 590,363 |
| Occupancy | $ | 154,706 |
| Record Storage | $ | 24,229 |
| Other Fees and Expenses | $ | 51,332 |